**STATE of Missouri, Respondent,**

v.

**Anthony SHAW, Appellant.**

**Anthony SHAW, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 56576, 57741, 57667, 58526 and 58638.

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 29, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 29, 1992.

---

RSMo 1986, and armed criminal action, § 571.015 RSMo 1986. In accordance with Section 565.020.2 RSMo 1986, the instructions to the jury on assessment of punishment and the verdict, the jury assessed the punishment for the murder charge as life imprisonment without eligibility for probation or parole and a three year term of imprisonment on the armed criminal action charge. The written sentence and judgment, however, reflected that on the conviction for murder first degree, he was sentenced, "for a period of fifty (50) years. * * LIFE IMPRISONMENT WITHOUT ELIGIBILITY FOR PROBATION OR PAROLE." We have not been provided with a copy of the sentencing transcript. Defendant appeals from his convictions and sentences and from the denials of his Rule 29.15 motions.

We affirm his convictions, and his sentence for armed criminal action but remand to the trial judge for further proceedings to determine the specific sentence that was imposed at sentencing and either correct the written sentence and judgment for first degree murder or resentence defendant in accordance with § 565.020 RSMo 1986. We reverse and remand the orders denying appellant's 29.15 motions.

Defendant does not question the sufficiency of the evidence. Defendant shot the victim, Ms. Barbara Johnson, sometime between 12:00 and 1:00 a.m. on January 12, 1988. Ms. Johnson and defendant had previously lived together and had two children. Two days prior to the shooting, Ms. Johnson and her two children came to the residence of her father, Mr. Ivy Johnson, to stay for a few days. Defendant did not join her.

Ms. Johnson and her two children were supposed to leave her father's residence on January 11 to stay with a friend of hers, a Ms. Tyse. On that night, Ms. Tyse and two male friends drove over to pick up Ms. Johnson and her two children. Ms. Tyse got out of the car, went into Mr. Johnson's residence and found Ms. Johnson was not ready to leave. Ms. Tyse picked up one of the children, carried him out of the resi-

Kathleen G. Green, St. Louis, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

## ORDER

On the court's own motion, the opinion previously adopted in this appeal is withdrawn. A new opinion is issued. Appellant's motion for rehearing and application for transfer is denied as moot.

SATZ, Judge.

A jury convicted defendant, Anthony Shaw, of murder, first degree, § 565.020

dence and started toward the car in which she had arrived.

Defendant had arrived at the scene in his car. As Ms. Tyse approached her car, defendant jumped out of his car, ran to her and "hit" her in the jaw. He appeared to be angry and said, "I thought you were my little sister." He then ran to the car in which she arrived, and kicked in the window on the driver's side, injuring the driver with flying splinters of glass. Ms. Tyse ran with the child she was holding to a house down the block.

By that time, Ms. Johnson was on the porch of her father's residence, and defendant started running toward her. She ran inside, up the stairs, calling for her father. Defendant came through the door and said, "Bitch, come down the steps right now . . . . I'm going to give you till three to come down . . . right now." As he counted, Ms. Johnson came down the steps. Defendant grabbed her by the neck with his left hand, put a gun to her neck with his right hand, and dragged her out onto the porch.

Ms. Johnson pleaded to defendant to stop, but he replied, "there ain't nothing happening, ain't nobody for her", called her a bitch and told her not to play him for a punk. Witnesses heard a shot, saw Ms. Johnson lying on the porch, and then saw defendant run toward his car. The gun was never found. Ms. Johnson died four days later without regaining consciousness. Defendant, testifying on his own behalf, said he shot Ms. Johnson accidently.

One of the several witnesses at the scene of the killing, who testified, was Courtney Bailey (Bailey), a sixteen-year old. In the trial court, defendant contended Bailey was under the jurisdiction of the juvenile court at the time of trial, and, prior to and during trial, defendant requested the production of Bailey's juvenile records for impeachment purposes. His requests were denied.

On appeal, defendant contends he "had a good faith [belief] that [Bailey] was coerced into making a statement favorable to the State in exchange for a deal on a pending charge", and, defendant contends, the court's refusal to order the production of Bailey's juvenile record prejudicially precluded him from proving this "deal" and, in turn, Bailey's bias. This argument is not supported by the record before us.

Defendant relies on *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and its progeny in Missouri. In *Davis,* the Court stated that the Sixth Amendment right to confrontation is largely embodied by the right to cross-examine an adverse witness, *Id.* at 315–316, 94 S.Ct. at 1109–1110, and a state policy to protect the confidentiality of juvenile records must yield to the constitutional right to cross-examine for the bias or ulterior motive of an adverse witness. *Id.* at 320, 94 S.Ct. at 1112. The Court expressly distinguished between two different uses of cross-examination for impeachment: (1) to discredit the general credibility of the witness, for example, using evidence of prior convictions, and (2) to attack the motivation of the witness to testify. *Id.* at 315–318, 94 S.Ct. at 1109–1111. The defendant must be permitted to use juvenile records for the latter purpose *Id.* at 320, 94 S.Ct. at 1112, and may be prohibited from using them for the former purpose. *Id.* at 321, 94 S.Ct. at 1112; Stewart, J. concurring.

■ Thus, in *Davis,* the Court held it was prejudicial error to preclude the defendant from using a witness's juvenile record to show he was on "probation", under the jurisdiction of the juvenile court, at the time he testified, which, in turn, precluded the inference that the witness may have been under "undue pressure because of his vulnerability as a probationer". *Id.* at 317–318, 94 S.Ct. at 1110–1111. A juvenile under the juvenile court's jurisdiction may expect favorable treatment from the state in exchange for his or her testimony, *State v. Chandler,* 682 S.W.2d 63, 65 (Mo.App. 1984), or, conversely, the juvenile may fear unfavorable treatment if he or she refuses to testify. *State v. Russell,* 625 S.W.2d 138, 141–142 (Mo.1981).

Defendant's argument parallels this reasoning. He believes Bailey was under the control of the juvenile court, which made Bailey susceptible to pressure to testify favorably for the state. This argument, however, has fatal defects.

At trial, defense counsel never did expressly establish that Bailey was under the control of the juvenile court, either at the time he testified or when he gave a statement to the police. We have read the two pages of transcript cited by defendant in support of this argument. There, defense counsel simply stated to the court that Bailey "has an extensive juvenile record", and he believes Bailey "was coerced into making a statement favorable to the state while he had a pending charge against him." But, after the court's refusal to order the production of Bailey's alleged juvenile record, defendant made no attempt to perfect the record for review. He made no offer of proof. He neither requested the records be produced for an offer of proof, nor did he request to voir dire Bailey out of the presence of the jury.

The latter method may have been the simplest method. If, for purposes of an offer of proof, Bailey was asked whether he was under the jurisdiction of the juvenile court and, in fact, he was, he would have no reason to deny it. If he did deny it, defense counsel could then insist Bailey's juvenile record be produced to complete his offer of proof.

The portion of the record relied on by defendant shows nothing more than his belief that Bailey was under the jurisdiction of the juvenile court and his belief that Bailey's testimony was coerced. Thus, neither the evidence nor an offer of proof provides a basis to support defendant's bald statement. That statement, without more, is an insufficient basis to convict the trial court of error. *See, State v. Chandler*, 682 S.W.2d 63, 65 (Mo.App.1984); *State v. Tolliver*, 562 S.W.2d 714, 720 (Mo. App.1978); *see also State v. Townsend*, 737 S.W.2d 191, 192 (Mo. banc 1987).[1]

▪ Moreover, at trial, defense counsel's expressed reason for the need of Bailey's juvenile record was not only to show Bailey's vulnerability. He also stated he need-ed that record to impeach Bailey "on his prior criminal record." This clearly would be an impermissible use of the juvenile record. *Russell, supra*, 625 S.W.2d at 141; *see also Davis, supra*. It was not error for the trial court to preclude defense counsel from using Bailey's juvenile record for an improper purpose.

▪ Furthermore, Bailey was one of five eye witnesses to the killing. Their testimony was consistent in detail and the same in substance. Thus, at best, Bailey's testimony was simply cumulative and corroborative of facts established by four other witnesses. This situation differs in kind from *Davis*, where the juvenile witness was not only the sole witness but was also a suspect. An attack on Bailey's credibility would do little, if any, damage to the state's case, and the lack of this attack worked no prejudice against defendant. *See, e.g. Chandler, supra*, 682 S.W.2d at 65.

Defendant also argues the court erred in admitting into evidence three pages of photographs, copied from a textbook, which show a .38 caliber revolver being fired. The prosecutor used the photographs in examining his firearms expert and in cross-examining defendant's expert. The photographs were used to show the manner in which gases are ejected from a revolver when it is fired. The gas escapes from the muzzle and from the gap between the cylinder and barrel of a revolver. Defendant contends these photographs prejudiced him because "no weapon was ever located in connection with this case, the photographs were impermissibly suggestive, and [two of the photographs] were not accurate reproductions." These arguments are not persuasive.

▪ Photographs are admissible if they enable the jury to better understand relevant testimony. *State v. Smith*, 781 S.W.2d 761, 766 (Mo. banc 1989), remanded on other grounds, 495 U.S. 916, 110 S.Ct.

---

1. We have read the entire five volume transcript. One of the detectives who interviewed Bailey did say his second interview of Bailey was conducted at the "juvenile detention center" because "at that time Bailey was remanded to the juvenile authorities on an unrelated charge." The effect of this testimony on the present issue was not demonstrated to the trial court nor to us.

1944, 109 L.Ed.2d 306 (1990); *on remand,* 790 S.W.2d 241 (Mo. banc 1990). The photographs in question here did that.

■ Witnesses testified the murder weapon was a .38 caliber revolver. Experts for both parties testified that the bullet which killed the victim was fired from a .38 caliber weapon, most likely a revolver. In addition, there was a lead deposit found on the left shoulder of Ms. Johnson's, the victim's, sweatshirt and a powder burn on her neck. This was consistent, witnesses testified, with the muzzle of the revolver being six inches or less from Ms. Johnson's neck and the cylinder gap being only a couple of inches from her shoulder when the revolver was fired. This showed the improbability of the shooting being accidental. The exhibits in question helped to understand all this testimony by illustrating how gas escaped from a revolver.

Although defendant states the copies of the photographs were inaccurate and their admission into evidence prejudiced him, he does not demonstrate how the inaccuracy worked its prejudice. The trial court acknowledged the copies were not perfect reproductions but, in admitting them, implicitly found they were fair reproductions for the purpose for which they were used. We have examined those copies. They simply show what happens to gases when a revolver is fired without any noticeable distortion.

■ The defendant also argues that the issues of what type of gun was used and whether it was fired at close range, were not contested issues. Because he admitted shooting the victim, albeit accidentally, the only issue, he argues, was his intent, and, therefore, the copied photographs were irrelevant and unduly prejudicial. We disagree.

The state's right to offer relevant evidence and have it received is not extinguished by a defendant's stipulation of fact. *E.g. State v. Clemons,* 643 S.W.2d 803, 805 (Mo. banc 1983). Moreover, during his case, defendant attempted to show the murder weapon could have been a rifle wielded by someone other than the defendant. Evidence of the "cylinder gap" discharge was therefore admissible to disprove this alternative inference offered by the defendant.

Defendant next argues the court erred in admitting into evidence a styrofoam model of a head with a pencil inserted into it to show the location of the wound, the angle taken by the bullet and, by implication, the orientation of the murder weapon. Defendant contends this exhibit was inadmissible because the head was not made to scale and because the pencil was not fixed so that it could not be removed.

■ Physical evidence does not have to be made to scale so long as the jury is not misled. *State v. Jackson,* 663 S.W.2d 312, 316 (Mo.App.1983). There is no showing here the jury was or could have been misled by the styrofoam head. To the contrary, the record shows the head would aid the jury. The state's expert used the head to illustrate the path of the bullet. Thus, it was an aid to an understanding of the expert's testimony; it would help the jury decide the position of the murder weapon in relation to Ms. Johnson's body; and it would corroborate the testimony of those witnesses who described the manner in which defendant held the gun to Ms. Johnson's neck. The head, therefore, was admissible. *State v. Holmes,* 609 S.W.2d 132 (Mo. banc 1980).

■ Defendant also contends the pencil was not fixed in the styrofoam head, and, therefore, the jurors could have removed the pencil and inserted "it anywhere in the head—in the eyes, ears or mouth for example." These imagined insertions of the pencil, defendant contends, would have inflamed the jury. Defendant's imagined insertions and imagined conclusion do not square with the record before us. We have examined the head. It has no eyes, ears or mouth, nor any holes other than the ones made at trial.

■ Defendant also argues the trial court erred in admitting the testimony of two of the state's witnesses, Ms. Sholonda

Johnson (Sholonda) [2] and Theophilus Murphy, Jr. because neither were endorsed prior to trial and the substance of Sholonda's testimony was not disclosed to defendant prior to trial.[3]

Defendant's trial started on Tuesday, February 21, 1989 and ended on Friday, March 3, 1989. On the Friday just before trial started, February 18, 1989, the prosecutor learned, for the first time, that Sholonda could testify about defendant's acts of jealousy regarding the victim, Ms. Johnson, and also that defendant possessed a gun shortly before the killing. Apparently, the prosecutor endorsed her as a state witness on that day. Sometime during the same day, the prosecutor made a number of witnesses available to defendant to depose or interview. Sholonda was one of them, but defendant neither disposed nor interviewed her.

On the second day of trial, Wednesday, February 22, defendant asked for and was granted the opportunity to interview or depose Sholonda. At the interview, defendant learned the substance of Sholonda's possible testimony. However, Sholonda did not testify until the following Monday, February 27. Thus, defendant had at least nine days from the date of Sholonda's endorsement and five days from his interview of her to prepare for her testimony.

■ Although defendant does not specifically complain about a late endorsement of Sholonda, his argument amounts to that. The trial court had discretion to permit the state to endorse additional witnesses "at any time after notice to the defendant and upon order of the court." Rule 23.01(f); *State v. Lamphier*, 745 S.W.2d 166, 170 (Mo.App.1987). Among the factors we consider to determine whether the trial court abused that discretion are whether defendant waived the objection, whether the state intended to surprise defendant or acted deceptively or in bad faith with an intent to disadvantage defendant, whether defendant was surprised and suffered any disadvantage, and whether the type of testimony might readily have been contemplated. *State v. Sweet*, 796 S.W.2d 607, 613 (Mo. banc 1990).

The facts we have detailed do not show the state acted deceptively or in bad faith, nor does the notice given to defendant of Sholonda's endorsement, nine days before her testimony, show defendant must have conducted his defense at a disadvantage. More important, defendant did not show the trial court and has not shown us how he would have prepared differently if notice were given to him prior to the time it was.

■ Defendant's complaint about the lack of prior endorsement of Theophilus Murphy, Jr. is apparently directed at a Theophilus Caldwell, Jr. Mr. Caldwell was endorsed by the state during trial and did testify for the state. However, he was located and interviewed by defendant several days before he was called as a witness. And, apparently, defendant, as well as the state, subpoenaed him as a witness. Moreover, defendant did not ask for a continuance to counter Mr. Caldwell's testimony for the state. Since defendant discovered and interviewed Mr. Caldwell prior to trial and asked for no continuance before or after he testified for the state, defendant cannot sensibly complain he was prejudiced by the court permitting Mr. Caldwell to testify.

■ Finally, defendant contends the court erred in failing to submit his proffered instructions on voluntary and involuntary manslaughter. He contends these instructions were supported by his testimony that he shot Ms. Johnson accidentally. This argument is misdirected and, thus, misses the mark.

The Court instructed the jury on murder, first degree and murder, second degree. The jury found defendant guilty of murder,

---

**2.** We use this witness's first name to distinguish her from the victim, Ms. Barbara Johnson.

**3.** Defendant does not argue here, and did not argue at trial, that the state violated Rule 25.-03(A), which requires the state upon written request to provide the defendant with any recorded statements of witnesses or any memoranda reporting or summarizing their oral statement.

first degree. Given the opportunity and option to find defendant guilty of the lesser offense of murder, second degree, the jury chose to find defendant guilty of murder, first degree. Moreover, defendants' manslaughter instructions themselves grant the jury's option to consider these offenses if, but only if, the jury "[did] not find the defendant guilty of murder in the second degree", a finding the jury never reached. Thus, there is no reasonable basis to infer the jury would have exercised greater leniency and reduced the conviction to manslaughter. *E.g., State v. Smith, supra,* 781 S.W.2d at 765–766; *State v. Merritt,* 734 S.W.2d 926, 932 (Mo.App.1987); *see also, State v. Smith,* 598 S.W.2d 118 (Mo. 1980). Therefore, the Court's failure to instruct the jury on manslaughter worked no prejudice against defendant.

### Rule 29.15 Motion

■ Defendant filed an unverified, pro se Rule 29.15 motion on July 12, 1989. A public defender entered his appearance on September 8, 1989, and was granted 30 days to file an amended motion. On October 19, 1989, the motion court dismissed the pro se motion on the grounds it was unverified and no verified, amended motion had been timely filed. The motion court's memorandum opinion stated it nevertheless examined the allegations raised in the defendant's pro se motion and found them lacking merit. The defendant appealed from the dismissal of this motion.

The transcript on the direct appeal of the defendant's conviction was filed in this Court on March 28, 1990. The defendant then filed a verified, pro se Rule 29.15 motion with the motion court on April 23, 1990, with a request for an evidentiary hearing. Counsel for the defendant filed a motion to vacate the judgment dismissing the first pro se motion on the ground that, under Rule 29.15(b), a Rule 29.15 motion need not be filed until 30 days after the transcript on appeal is filed. The motion court dismissed the second Rule 29.15 motion, on the ground it was a successive motion prohibited by Rule 29.15(k) and denied defendant's request to vacate its judgment on defendant's first Rule 29.15 mo-

tion. Defendant also appealed from this order of dismissal.

Defendant argues the motion court erred when it dismissed his first pro se motion on the ground the time to file a verified motion had passed. We agree.

In *State v. White,* 798 S.W.2d 694 (Mo. banc 1990), the Court reconciled an inconsistency in the requirements of Rule 29.15. Rule 29.15(b) requires that a motion under this Rule be filed within 30 days after the filing of the trial transcript on appeal. Rule 29.15(f) requires that an amended motion be filed within 30 days after the date counsel is appointed to represent the defendant on his Rule 29.15 motion, or, within 30 days of the entry of appearance of counsel who is not appointed. A literal reading of these sections of the Rule penalizes postconviction movants who file early, before the trial transcript is prepared, and have counsel appointed before the transcript is available; it forces counsel to prepare an amended Rule 29.15 motion without access to the trial transcript. *White, supra* at 696. To resolve this inconsistency, the Court held that the time limit in Rule 29.-15(f) begins at the earliest date that motion counsel had been appointed or has made an appearance and there exists a trial transcript properly filed with the appellate court. *Id.*

We apply the holding of *White* here. The trial transcript in defendant's direct appeal was filed with this Court on March 28, 1990. Therefore, the motion court's ruling on October 19, 1989, that defendant was out of time to amend his motion was in error. *White, supra.* We therefore reverse and remand the motion court's judgments on defendant's motions.

We direct the court to reinstate defendant's Rule 29.15 motion and hold further proceedings. For purposes of judicial economy, we construe defendant's verified, second pro se motion to be an amendment to his first motion, so that there is a verified pro se motion before the motion court. The court should appoint counsel, if one is needed, and grant him or her sufficient time to prepare an amended Rule 29.15

motion or such other pleadings as counsel considers proper to protect defendant's interests.

Judgment on convictions and sentence for armed criminal action are affirmed, and cause is remanded for further proceedings to determine the specific sentence that was imposed at sentencing and either correct the written sentence and judgment for murder first degree or resentence defendant in accordance with § 565.020 RSMo 1986. Judgments on Rule 29.15 motion's reversed and remanded.

SMITH, P.J., and CARL R. GAERTNER, C.J., concur.