STATE of Missouri, Respondent,

v.

Terry BANKS, Appellant.

No. 20264.

Missouri Court of Appeals,
Southern District,
Division Two.

April 19, 1996.

Emmett D. Queener, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, David R. Truman, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant guilty of murder in the first degree, § 565.020, RSMo Cum.Supp. 1992, and assessed punishment at imprisonment for life without eligibility for probation or parole. The trial court entered judgment per the verdict.

Appellant brings this appeal, averring the trial court erred in (1) overruling Appellant's objection to a comment by the prosecutor during final argument, (2) receiving in evidence, over Appellant's objection, incriminatory statements by Appellant to an investigator, and (3) allowing the State to endorse a witness five days before trial.

The victim was Tim Eastburn. He was shot twice at his home in McDonald County on November 19, 1992. The second shot caused immediate death.[1]

Appellant does not challenge the sufficiency of the evidence to support the verdict, hence we recount only the evidence necessary to address the claims of error, viewing it in the light most favorable to the verdict. *State v. Schaal,* 806 S.W.2d 659, 661 (Mo. banc 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992).

In early November, 1992, Dennis Johnson ("Johnson")[2] was acquainted with Matt Meyers[3] ("Matt") and Appellant. At that time, Johnson resided in a trailer "about midway between Joplin and Neosho" with three other people, one of whom was Sheena Eastburn ("Sheena"), ex-wife of the eventual victim ("Tim"). Matt and Appellant resided in an apartment at Duenweg. Tim resided in a house on Route JJ, two and a half miles south of Highway 76 outside Rocky Comfort.

According to Johnson, Appellant and Sheena had recently "started dating" and "were really close."

Johnson testified that on November 17, 1992, he drove himself, Matt and Appellant to Tim's residence in a Ford pickup. Either Matt or Appellant—Johnson avowed he could not "honestly say" who—entered the house through the back door and brought out an "AK-47 assault rifle."

The trio then proceeded "to a residence somewhere outside of Joplin" and showed the rifle to a man "to see if he wanted to buy it." He refused.

The trio then went to the trailer where Johnson resided. There, Johnson "part[ed] company" with Matt and Appellant.

Unknown to the trio, William Finan, a neighbor of Tim, saw the Ford pickup enter Tim's driveway. Finan watched the trio exit the pickup and go behind Tim's house. Using a telescope, Finan spotted the pickup's license number, which he recorded. Finan heard "a loud noise behind the house," but did not know what it was. After some ten minutes, the trio departed.

When Tim arrived home, Finan saw Tim enter the house and come back outside. Finan approached Tim. Tim said someone "had broke into his house." Finan told Tim, "I've got the tag number, I watched them do it." Finan described the pickup, whereupon Tim said his ex-wife "had come to clean him out."

Tim "called the police" on Finan's telephone. Deputy Sheriff Joe Mathis of McDonald County and another officer responded to the call. Tim told Mathis the intruders had taken "an AK-47" with a full clip of ammunition. Finan gave Mathis the license number of the pickup. The number was traced to Richard Meyers, Matt's father.

On November 18, 1992 (the day after the burglary), Matt and Appellant were at a trailer where Matt's cousin, Eddie Brickey, resided. Matt and Appellant had a rifle and

---

**1.** The case was tried in Greene County on change of venue.

**2.** As shall become evident, many people appear in this narrative. After introducing each, we

shall refer to him or her by forename or surname, as convenient, for brevity and clarity.

**3.** His surname also appears as "Myers" in the record.

a dog. At trial, Brickey was shown Tim's AK–47. He identified it as the rifle he saw November 18.

According to Brickey, Matt and Appellant left the trailer in a pickup, taking the rifle and dog with them. They later returned with the rifle, but without the pickup and dog. Brickey quoted Matt and Appellant as saying they pushed the pickup into "a water-filled mine shaft."

The next day, November 19, 1992, Brickey, Sheena, Matt and Appellant went to "some apartments in Webb City" in a "1978 Trans Am" owned by Brickey's "girlfriend." There, Brickey loaned the Trans Am to Sheena. She, Matt and Appellant drove away, leaving Brickey at the apartments. Brickey's testimony continued:

"Q. Did they have the rifle with them when they left?

A. Yes.

Q. Who was carrying the rifle when they left, if you recall?

A. I don't recall.

Q. But one of the three of them was?

A. Yes."

The next time Brickey saw the Trans Am was "about 11:00 o'clock" the next morning. It was parked in front of Richard Meyers' trailer.

Johnson, the third participant in the burglary, testified that on the evening of November 19, 1992 (the date Sheena borrowed the car from Brickey), Sheena, Matt and Appellant arrived at the trailer Johnson shared with Sheena and others. Using the borrowed car, Sheena, Matt and Appellant gave Johnson a ride to a Joplin bar. Johnson saw Tim's AK–47 in the trunk. Johnson explained, "[I]t was pulled up part way through a speaker hole in the back of the car."

Asked whether Sheena said anything en route to the bar, Johnson avowed Sheena said "there was more in the house than what they had got . . . [Tim] had money and drugs and . . . she knew where everything was." Johnson's testimony continued:

"Q [D]id she suggest at any point, that they—the three of them, should kill Tim Eastburn?

A She mentioned that Tim had raped her before, and that he had been very mean to her and stuff, and that she— the comment was made that she wished that he was dead.

Q Did the Defendant respond to that?

A There was—him and Matt Meyers both responded, I'm not sure who said it first, but one of them made the comment that, I will kill him, and the other said, well, if you don't, I will."

Johnson exited the car upon arrival at the bar.

Later that night (November 19, 1992), Finan, Tim's observant neighbor, saw a car pause at Tim's driveway approximately thirty seconds, then proceed south, turn around, and return north. It stopped on the road "and the lights went out."

Some five minutes later, Finan heard a gunshot. Within a minute thereafter, he heard a "muffled" sound. He then heard voices and heard the car start and depart. He immediately called "the authorities." The call was logged at 10:51 p.m.

Deputy Sheriff Mathis and another officer responded to the call. Mathis saw a shell casing on a back porch step and a "busted" window next to the back door. Mathis then went to the front door, looked in, and saw Tim on the floor. Mathis "kicked the door in," entered the house, and determined Tim was dead.

An autopsy revealed Tim had been shot twice. One bullet entered his back near the left shoulder blade, passed through the spine, completely severed the spinal cord, and exited the right side of the neck. The destruction of the spinal cord detached the brain from the rest of the body, causing instant paralysis from the neck down and making death inevitable within twenty minutes.

The second bullet entered Tim's head at the right temple and exited the left side of the head. This was a "contact wound," i.e., the muzzle of the gun "was held tightly against the skin." This wound was instantly fatal.

Matt's sister, Angela Vaughn, testified Matt and Appellant arrived at the residence

of her and her husband, Carey Vaughn, in Baxter Springs, Kansas, between 5:30 and 6:00 a.m., November 20, 1992. According to Angela, Baxter Springs is a thirty-minute drive from Joplin.

Matt and Appellant asked whether they could stay. Angela agreed, and returned to bed. Carey stayed up, getting ready for work.

Later that day, Angela visited her mother. A "bunch of policemen" were there, looking for Matt and Appellant.

Upon returning to her home, Angela drove Matt and Appellant, at their request, to "Sonny's Market" near Carl Junction. She "dropped them off" after dark, "about 9:00 o'clock."

Five days before trial, the prosecutor filed a motion to endorse Angela's husband, Carey, as a State's witness. At the start of the trial, Appellant objected. The trial court permitted the endorsement. That ruling is the subject of Appellant's third point, addressed *infra*.

Carey testified Appellant was "nervous" when he and Matt appeared at Carey's home November 20, 1992. Asked whether Appellant said anything, Carey replied: "He said that he shot a guy, and Matt said we shot a guy. And Terry said no, you're not taking the rap on this." Later that day, Carey learned the police were looking for Matt and Appellant.

Two days later, on November 22, 1992, Jasper County authorities received information that Matt had been seen in Stringtown "just outside of Carl Junction." Deputy Sheriff Kevin Martin of Jasper County and other officers went to the area and established a "perimeter" around a trailer at Sonny's Mart. Using a public address system, Martin ordered Matt out of the trailer. Matt eventually came out and was taken into custody.

Martin and another officer then entered the trailer and discovered Appellant "attempting to go underneath a bed in the back bedroom." Martin apprehended Appellant and informed him of his rights under "the *Miranda* decision." [4] Martin asked Appellant if he understood. Appellant said yes. Martin turned Appellant over to one of Martin's "supervisors," without interrogation.

Trooper Miles Parks of the Missouri State Highway Patrol, a major case investigator, was one of the officers who examined the scene of Tim's murder. Parks was notified November 22, 1992, that Matt and Appellant had been located near Carl Junction. Parks went there and encountered Appellant seated in a patrol car.

After verifying that Appellant had been "advised of his rights," Parks told Appellant that he (Parks) "knew exactly what had happened, and that it was time for him to tell me what had happened." However, Parks did not question Appellant in the car.

Parks saw Appellant later that afternoon at the jail in Carthage. Parks advised Appellant of his rights from a "*Miranda* card". Parks then questioned Appellant about Tim's murder. Appellant revealed his role in it.

Prior to trial, Appellant filed a motion to suppress his statements to Parks.[5] The trial court denied the motion after an evidentiary hearing. That ruling is the subject of Appellant's second point, addressed *infra*.

Parks gave the jury a narrative account of Appellant's version of the homicide. We synopsize it in the next twelve paragraphs.

1. The weapon used in killing Tim was stolen from Tim's residence two days before the homicide. After the theft, and before the murder, Appellant shot the weapon northeast of Webb City "where they had killed a dog."

2. Matt "wanted to kill somebody." Sheena said: "[L]et's kill my ex-husband."

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The trial court's docket sheet shows a "Motion to Suppress Statements" was filed March 1, 1995. Appellant's brief says a copy of that motion appears in a *second* supplemental legal file in the record on appeal. Our docket sheet does not show Appellant ever filed a *second* supplemental legal file. Appellant filed a legal file October 19, 1995, and a supplemental legal file December 21, 1995. No copy of a "Motion to Suppress Statements" appears in either file.

The plan was that Sheena would position Tim "on the couch next to the front door."

3. Sheena's mother had told Sheena about the burglary. Sheena called Tim; he told her the license number on the burglars' truck had been obtained by a neighbor. Sheena told Appellant the truck had been identified.

4. Sheena drove the borrowed car to Tim's residence because neither Appellant nor Matt had a valid driver's license. Upon arrival, Sheena stopped at the driveway, exited the car, and went to the residence. Matt then drove south and parked the car adjacent to the road.

5. Matt removed the loaded rifle from the trunk. He and Appellant walked to the back of Tim's house. From the back porch, they looked inside and saw Sheena in a chair talking to someone on a couch.

6. Sheena exited the house through the front door, walked to the back, got a small dog from the basement, smiled at Matt and Appellant, and reentered the front door.

7. Tim eventually appeared in the kitchen, followed by Sheena. Appellant pointed the rifle at Tim and fired "through the window." Tim "dropped."

8. Sheena knelt by Tim. Tim "was trying to talk, trying to raise up." Sheena "tried to soak up some of the blood, or stop some of the bleeding." Matt told Appellant: "[S]hoot him again and get him out of his misery."

9. Appellant yelled at Sheena "to come on." Sheena exited through the back door. Matt took the rifle from Appellant. Appellant and Sheena ran toward the car. Before reaching it, Appellant heard a shot.

10. Either Matt or Appellant put the rifle in the car trunk. Sheena drove to the trailer she shared with others, changed her shirt, got a towel for herself and Appellant, and got another towel for Matt.

11. Sheena drove to a "truckline" across the street from the apartment shared by Matt and Appellant. Joplin police arrived and took Sheena to headquarters for questioning.

12. Driving the borrowed car, Matt took himself and Appellant to the residence of Matt's father, Richard, in Webb City. Richard drove Matt and Appellant to the home of Angela Vaughn in Baxter Springs. Matt and Appellant spent that day (November 20, 1992) there. That evening, Angela took Matt and Appellant to the trailer where they were arrested two days later.

Parks learned from Matt that Tim's rifle had been discarded in a water-filled pit at a mine entrance "directly east of [Matt's] parents' home in Webb City." On November 24, 1992, a scuba diver retrieved the rifle. The magazine was in place; the safety was off and a round was in the chamber.

The Ford pickup owned by Richard Meyers was found in a larger pit near the one that yielded the rifle.

The State presented additional evidence, but inasmuch as the sufficiency of the proof to support the conviction is unchallenged, we need not recount it.

■ In addressing Appellant's claims of error, we begin with the second point. It avers the trial court erred in denying Appellant's motion to suppress his statements to Parks, and in allowing Parks to recite Appellant's statements to the jury, in that Parks took the statements in violation of Appellant's privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, § 19 of the Constitution of Missouri. Specifically, argues Appellant, Parks interrogated Appellant after Appellant "had invoked his right to an attorney, without an attorney being made available to [him]."

Because the narrow issue in the preceding sentence is the only one presented by Appellant's second point, we set forth only the evidence pertinent to that issue.

As reported earlier, Parks' interrogation of Appellant occurred at the jail in Carthage the afternoon Appellant was arrested. At the hearing on the motion to suppress, Parks testified he advised Appellant, *inter alia:* "You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent

you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements." Then, this:

"Q Upon reading those to the Defendant, did you ask him if he understood them, those rights?

A I'm sure I did.

Q And did he respond that he did?

A Yes.

Q Did you ask him then if he wished to waive those rights and speak with you?

A I asked—I'm sure I asked him if he wanted to give a statement and tell me what happened, which he did.

Q And did he agree to do so?

A Yes.

. . . .

Q ... And at any time, did the Defendant invoke any of his rights and request to stop speaking with you?

A No.

Q Did you get a complete statement from him, then, without the exercise of any of his Constitutional rights on his part?

A Yes.

. . . .

Q ... [A]fter you read Mr. Banks the warning from the card, then you went ahead and talked to him, is that right?

A Yes.

Q And did he say anything to you about not wanting to talk to you?

A No.

Q You didn't specifically ask him if he wanted to waive any of those rights, did you?

A I don't think I used that term, no.

. . . .

Q Prior to his incarceration at the Jasper County sheriff's office ... did you hear Mr. Banks say anything about an attorney—him needing an attorney, him wanting an attorney, him asking to talk with an attorney?

A No.

Q How about after you arrived at the Jasper County sheriff's office, when you talked to Mr. Banks, what was said about him needing, or wanting to talk to an attorney?

A He said nothing about wanting an attorney.

Q He didn't say anything at all to you about maybe he ought to talk to an attorney before he makes a statement?

A No.

. . . .

Q During that conversation, before the tape recording was made, was there any conversation about whether he needed an attorney, or whether an attorney would be appointed to represent him?

A He was advised of his rights and that was discussed. He was told that if he wanted an attorney, one would be appointed for him before any questioning. I don't recall any discussion by him requesting any attorney. If that was done, we wouldn't have—I wouldn't have interviewed him."

Appellant testified at the suppression hearing. His testimony:

"Q Do you remember [Parks] asking you if you waived those Miranda rights?

A No, I don't.

Q Do you—at any time did you ever say, I waive those rights?

A No, I didn't.

Q Was there any conversation between you and Miles Parks about an attorney, about whether you needed an attorney, or ought to talk to an attorney?

A I asked for an attorney.

Q At what point did you do that?

A It was right towards the beginning of the—of interrogation. Right after—not too long after he started was the first time I asked for one.

Q And what was his response?

A I'm not going to quote him word-for-word, but it was something in the sense that if I was—I could probably get a lawyer, but the only thing a lawyer was going to do was tell me to keep my mouth shut, and I'd probably never get to say my—my part.

Q You probably what?

A Never get to give my side of the story or something.

Q Was anything else said after that about an attorney, whether you ought to have one, or whether you could request one?

A By them, no. By him, no. I said something later on.

. . . .

Q What did you say later on?

A Pretty much the exact same thing. I was told the exact same thing.

Q By Miles Parks?

A By Miles Parks.

. . . .

Q If you wanted a lawyer, why is it you went ahead and told him that you shot and killed Tim Eastburn?

. . . .

A I was—I was pretty upset at the time I was arrested, and while this was going on, and to tell you the truth, I thought I was just doing the right thing. I was—I really don't know."

 When an accused moves to suppress a statement on the ground it was taken in violation of the *Miranda*[6] doctrine, the State bears the burden of proving the accused properly waived his rights. *State v. Powell,* 798 S.W.2d 709, 713 (Mo. banc 1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). The State's burden is by a preponderance of the evidence. *Id.* at 713. The totality of circumstances must indicate the waiver was voluntary, knowing and intelligent. *Id.* The question of waiver is one of fact, and the trial court's findings of fact concerning waiver will not be overturned unless clearly erroneous. *Id.* Conflicts in the evidence and the credibility of witnesses are matters for the trial court to resolve. *Id.*

The trial court here made no explicit finding on whether Appellant waived his right to counsel before his revelations to Parks. At the conclusion of the suppression hearing, the trial court announced only this laconic ruling: "The Defendant's Motion to Suppress Statements filed March the 1st, 1995[7] . . . [is] overruled."

 However, Appellant does not argue that the trial court's ruling is too abbreviated for appellate review. On that subject, we note a judge need not make any particular formal finding on an issue regarding waiver of *Miranda* rights. *State v. Schnick,* 819 S.W.2d 330, 336 (Mo. banc 1991). The only prerequisite is that the trial court's conclusions make unmistakably clear that the confession is voluntary. *Id.*

For the reasons that follow, we find the trial court's ruling sufficient for review on the narrow issue presented by Appellant's second point, i.e., whether Appellant waived his right to counsel.

In *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the accused was arrested and advised of his *Miranda* rights. 441 U.S. at 370–71, 99 S.Ct. at 1755–56. He said he understood them but refused to sign a written waiver. *Id.* at 371, 99 S.Ct. at 1756. He was told he need neither speak nor sign the form, but that the officers would like him to talk to them. *Id.* The accused replied, "I will talk to you but I am not signing any form." *Id.* He then made inculpatory statements without requesting counsel or attempting to terminate the interrogation. *Id.*

 The trial court in *Butler* denied the accused's motion to suppress the inculpatory statements, finding the accused waived his right to have a lawyer present during questioning by indicating he was willing to answer questions. *Id.* at 371–72, 99 S.Ct. at 1756–57. The Supreme Court of the United States upheld the trial court, explaining that an express written or oral waiver of the right to counsel "is not inevitably either necessary or sufficient to establish waiver." *Id.* at 373, 99 S.Ct. at 1757. The question is not one of form, but rather whether the accused in fact knowingly and voluntarily waived the right. *Id.* In some cases, waiver can be clearly inferred from the actions and words of the person interrogated. *Id.*

The facts in the instant case are virtually identical to *Butler.* Parks testified he ad-

---

6. Footnote 4, *supra.*

7. Footnote 5, *supra.*

vised the Appellant of his *Miranda* rights, and Appellant responded that he understood. Then, avowed Parks, he asked Appellant if he wanted to give a statement "and tell me what happened," and Appellant agreed to do so. At no time, according to Parks, did Appellant invoke any of his rights or request "to stop speaking." Additionally, said Parks, Appellant said nothing about wanting to talk to an attorney before making a statement.

Although Appellant testified otherwise, the trial court was not obliged to believe Appellant, as credibility of witnesses was an issue for the trial court to resolve. *Powell,* 798 S.W.2d at 713. Implicit in the trial court's denial of Appellant's motion to suppress is the conclusion that Appellant's testimony lacked credibility. *State v. Royal,* 610 S.W.2d 946, 948[2] (Mo. banc 1981).

In *State v. Weems,* 800 S.W.2d 54 (Mo. App.E.D.1990), the Eastern District of this Court held: "A voluntary waiver [of *Miranda* rights] need not be in writing. It can be made orally by replying to questions after warnings are given." *Id.* at 56[4], citing *Butler, supra,* and *State v. Clark,* 592 S.W.2d 709, 716 (Mo. banc 1979), *cert. denied,* 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57 (1980).

Consistent with the authorities heretofore cited, we hold Parks' testimony supplied ample evidentiary support for the trial court's implicit finding that Appellant knowingly and voluntarily waived his right to counsel at the outset of his interrogation by Parks and did not thereafter invoke such right during the interrogation. Appellant's second point is denied.

■ We next address Appellant's third point. As we have seen, it claims the trial court erred in granting the State's motion (filed five days before trial) to endorse Carey Vaughn as a witness.

■ A trial court has broad discretion in permitting endorsement of additional witnesses; there is an abuse of discretion only when the endorsement causes fundamental unfairness. *State v. Milan,* 829 S.W.2d 123, 124[2] (Mo.App.S.D.1992), citing *State v. Stepter,* 794 S.W.2d 649, 655 (Mo. banc 1990). Generally, four factors are used to determine whether a trial court abused its discretion in allowing the State to endorse a witness shortly before trial: (1) whether the accused waived the objection; (2) whether the State intended surprise or acted deceptively or in bad faith, intending to disadvantage the accused; (3) whether the accused was surprised and suffered any disadvantage; and (4) whether the type of testimony given might readily have been contemplated. *Milan,* 829 S.W.2d at 124[3]; *Stepter,* 794 S.W.2d at 655[12].

Applying those factors to Appellant's third point, we note Appellant did not waive the objection (factor 1). Appellant does not maintain the State intended surprise or acted deceptively or in bad faith, intending to disadvantage Appellant (factor 2). Similarly, Appellant does not aver he was surprised by Carey's testimony (factor 3). Nonetheless, says Appellant, Carey's testimony was harmful and prejudicial, resulting in fundamental unfairness.

In determining whether it was fundamentally unfair to permit Carey to testify, we observe Appellant told Parks he (Appellant) was at the Vaughn home a few hours after the murder and remained there throughout the day, November 20, 1992. Consequently, Appellant cannot assert he was surprised that Carey claimed to have heard what Appellant said that morning. Furthermore, Appellant testified at trial and did not deny making the inculpatory statements attributed to him by Carey. Therefore, the only claim of surprise Appellant can make is that he did not foresee Carey would reveal to the State what Carey avowed he heard Appellant say. Appellant cannot claim he was surprised by the content of Carey's testimony (factor 4).

Appellant offers no explanation as to how he could have countered Carey's testimony had the State endorsed Carey as a witness at an earlier date. *See: State v. Shaw,* 839 S.W.2d 30, 36 (Mo.App.E.D.1992). We therefore hold that while Carey's testimony was undeniably harmful to Appellant, the late endorsement of Carey as a State's witness was not fundamentally unfair. Accordingly, we rule the trial court did not abuse its discretion in permitting the endorsement. Appellant's third point is denied.

Appellant's first point, the only one not yet addressed, is based on the following segment of the prosecutor's closing argument:

"They dumped the truck that could tie them to the burglary and the theft, but they kept the rifle that could also tie them to the burglary and theft, because they needed it to make sure that dead men told no tales. They went back out there and they made sure of Tim Eastburn. Did he do it all by himself? No, he was in it up to his neck. Any suggestion that this is not murder in the first degree, and that he did not do it, is absurd. Do your duty. Find him guilty of murder in the first degree. Tell your fellow citizens of McDonald County you understand the seriousness of this situation, and let's ensure that this man never has the opportunity to kill again.

[Appellant's lawyer]: Objection Your Honor, argumentative about future activities. That's totally improper.

THE COURT: Objection's overruled.

[Prosecutor]: Do your duty."

The last-quoted remark ended the prosecutor's argument.

■ Appellant maintains the trial court committed reversible error in overruling the objection set forth above in that the prosecutor "argued [Appellant's] criminal proclivity and the necessity for deterring [him] from future crimes when [the prosecutor] requested the jury to 'ensure that this man never has the opportunity to kill again.'" According to Appellant, the prosecutor's argument deprived Appellant of his constitutional rights to due process of law and a fair trial before a fair and impartial jury.

Citing *State v. Raspberry,* 452 S.W.2d 169, 172[5] (Mo.1970), and *State v. Joles,* 755 S.W.2d 622, 624[3] (Mo.App.E.D.1988), Appellant emphasizes it is improper for a prosecutor to argue as to an accused's criminal proclivity or the necessity of preventing him from committing future crimes. The basis

for the rule is that an accused is on trial for the conduct charged against him, not for what he might do in the future. *Raspberry,* 452 S.W.2d at 172; *Joles,* 755 S.W.2d at 624.

While *Raspberry* and *Joles* set forth the applicable law, they are not factually identical to the instant case. In *Raspberry,* the trial court sustained the accused's objection to the argument and instructed the jury to disregard it. 452 S.W.2d at 172. However, the trial court denied the accused's request for mistrial. *Id.* The Supreme Court of Missouri held the denial of a mistrial was not an abuse of discretion. *Id.* at 173. The conviction—murder in the first degree—was affirmed. *Id.* at 175.

In *Joles,* the accused failed to object to the argument, hence the appellate court reviewed for only plain error. 755 S.W.2d at 624. Finding the argument had no decisive effect on the jury, the appellate court affirmed the conviction. *Id.*[8]

Here, the trial court overruled Appellant's objection to the argument. In that respect, the instant case is like *State v. Davis,* 825 S.W.2d 948 (Mo.App.E.D.1992). There, the prosecutor told the jurors that the defense "wants you to let him go out the door so he can prey on other women here in the City." *Id.* at 951. The trial court overruled the accused's objection, whereupon the prosecutor pursued the theme by asking the jurors to return a verdict of guilty on each count "so that people like [the victims] will not be confronted by him on the streets in the city of St. Louis." *Id.*

The Eastern District of this Court held:

"[B]road discretion rests with the trial court in controlling closing argument, with wide latitude accorded counsel in their summation. We will reverse a ruling for abuse of discretion only where the argument is plainly unwarranted ... and only if the State's remarks had a decisive effect on the jury.

In view of the certainty with which each of defendant's victims identified him, it

---

**8.** Two other cases cited in the briefs, *State v. Sielfleisch,* 884 S.W.2d 422 (Mo.App.E.D.1994), cited by both sides, and *State v. Kalter,* 828 S.W.2d 690 (Mo.App.E.D.1992), cited by the State, are likewise different from the instant case

in that appellate review in both of those cases was for plain error only. *Sielfleisch,* 884 S.W.2d at 430; *Kalter,* 828 S.W.2d at 692. Both cases held the argument did not constitute plain error.

cannot be said that the circuit attorney's argument caused the jury to return verdicts different from those which otherwise would have been returned. Furthermore, although closing arguments directed toward putting the jurors in fear for their own safety in the event of acquittal have been condemned, the prosecutor may argue the evil that can result to society if a defendant is found not guilty. In conclusion, although the comment in question may have been the product of prosecutorial overzealousness, it could not reasonably be held to have had a decisive effect upon the verdicts."

*Id.* at 951–52[4, 5] and [6] (citations omitted). The Eastern District affirmed the conviction. *Id.* at 954.

The prosecutor's argument in the instant case was not as egregious as the one in *Davis.* After the accused's objection was overruled in *Davis,* the prosecutor repeated the warning that if the jury failed to convict the accused, he would again be confronting people on the streets. Here, even though the trial court overruled Appellant's objection, the prosecutor apparently realized he was on forbidden ground, as he said nothing more about ensuring that Appellant had no opportunity to kill again. The prosecutor uttered only three more words: "Do your duty."

In *State v. Roberts,* 838 S.W.2d 126 (Mo. App.E.D.1992), as here, the jury was required to decide whether the accused deliberated before killing the victim, the pivotal issue in determining whether the accused was guilty of murder in the first degree. *Id.* at 132. The trial court overruled the accused's objections to improper argument by the prosecutor. *Id.* at 131.

The Eastern District of this Court declared Missouri has not adopted a *per se* rule of mandatory reversal in all cases where objectional argument is made by a prosecutor. *Id.* Error which in a close case might require reversal may be disregarded as harmless when the evidence of guilt is strong. *Id.*

■ Furthermore, explained *Roberts,* the appellate court evaluates the facts of each case independently, and reverses a conviction only if the challenged comments had a deci-

sive effect on the verdict. *Id.* at 131–32. For such comments to have had a decisive effect, there must be a reasonable probability that, absent the comments, the verdict would have been different. *Id.* at [10].

No such probability exists here. Appellant admitted to Parks that he (Appellant) fired the first shot at Tim—a shot that inflicted a wound from which Tim would have died but for the second shot, which was instantly fatal. Appellant repeated that admission in his trial testimony. Thus, there was no dispute about Appellant's role in the homicide. As acknowledged by Appellant in his brief, the "real matter at issue" before the jury was whether Appellant deliberated before shooting Tim. In Appellant's words, the presence or absence of deliberation was the "determinative factor" in deciding whether he committed murder in the first degree or murder in the second degree.

In an effort to convince the jury he did not deliberate about killing Tim, Appellant testified he did not believe Matt and Sheena were serious when they mentioned it. Appellant apparently hoped the jury would conclude he ascended Tim's back porch with no murderous intent and shot Tim impulsively when handed the rifle by Matt.

The prosecutor's argument immediately preceding the improper remark was obviously aimed at convincing the jury otherwise, and was fair comment on the evidence. The improper remark was brief, and after Appellant's objection the prosecutor said nothing else about Appellant committing future crimes.

We find no reasonable probability that, absent the improper remark, the verdict would have been different. We therefore hold the remark had no decisive effect on the verdict, hence reversal is unwarranted. *Roberts,* 838 S.W.2d at 131–32; *Davis,* 825 S.W.2d at 951–52.

Appellant's first point is denied, and the judgment is affirmed.

PREWITT, P.J., and SHRUM, C.J., concur.