**STATE of Missouri, Respondent,**

v.

**James E. SCHNICK, Appellant.**

No. 70584.

Supreme Court of Missouri,
En Banc.

Nov. 19, 1991.

Craig A. Johnston, Columbia, for appellant.

William L. Webster, Atty. Gen., John Morris, Asst. Atty. Gen., Jefferson City, for respondent.

HOLSTEIN, Judge.

Defendant James E. Schnick was charged with seven counts of first degree murder. Section 565.020.[1] Four of the counts were dismissed by the state prior to trial "without prejudice" to refiling. A jury trial was conducted on the three remaining counts. Defendant was found guilty of the murders of Julie Schnick, Kirk Buckner, and Michael Buckner. Pursuant to the jury's findings and assessment of punishment, the trial judge sentenced defendant to death on each of the three counts. Section 565.020.2. Defendant appeals those convictions. Defendant also filed a motion for post-conviction relief pursuant to Rule 29.15. Following a hearing,

1. All references to statutes are to RSMo 1986 unless otherwise specified.

post-conviction relief was denied. Defendant's appeal from the denial of post-conviction relief was consolidated with the direct appeal. *Rule 29.15(l)*. Because the punishment imposed is death, this Court has jurisdiction. *Mo. Const. art. V, § 3*. Reversed and remanded for new trial.

## FACTS

Defendant lived with his wife, Julie Schnick, and their two children on a farm in Webster County, Missouri. Julie's brother, Steve Buckner, lived with his family on another farm in Webster County about seven miles from the Schnick farm. The Steve Buckner family consisted of Steve, his wife Jeanette, and their four children. The four children's names and ages were: Kirk, fourteen; Dennis, eight; Timmy, seven; and Michael, two. In the early morning hours of September 25, 1987, Julie Schnick, Steve Buckner, Jeanette Buckner and the four Buckner children were shot to death.

The first persons to arrive at the Schnick farm after the shootings, besides the defendant, were the parents of Julie Schnick, Alfred and Jean Buckner. At about 6:00 a.m. they found defendant lying in the kitchen with wounds in his abdomen and lower leg. In the bedroom, Jean Buckner found the body of Julie Schnick with two bullet wounds in her forehead. Kirk Buckner's body was found a short distance from the defendant. Kirk had been shot three times: in the chest, neck, and back. In addition, Kirk had been stabbed twice. A .22 caliber revolver was found in Kirk's right hand. Alfred Buckner asked what had happened, to which defendant replied, "Kirk came in the door shooting."

Among the officers at the scene that morning were Webster County Sheriff Eugene Fraker and Deputy Sheriff Don Roe. Around 7:15 a.m. Fraker sent Roe to the Steve Buckner home. Roe, accompanied by another officer, found the bodies of the three youngest Buckner children. Timmy and Dennis Buckner were in their beds. Each had been shot twice in the head. Two year old Michael was in a playpen in the living room. He had been shot once in the temple. Jeanette Buckner's body was found in front of a milk barn on the Buckner property. She had been shot once in the head. Steve Buckner was the last to be found. His body was located along the gravel road running between the Schnick and Buckner farms.

Defendant was transported to a hospital in Springfield. His wounds proved to be minor. On September 26, 1987, Deputy Sheriff Don Roe and his wife visited defendant in the hospital. Roe interviewed defendant about the shootings. Defendant gave an account of the events indicating that the homicides were preceded by a long period of hostility between defendant and Steve and Kirk Buckner. Defendant also admitted to having been involved in an extramarital affair for some time prior to the homicides. Defendant gave his account of the events that occurred that morning in which he claimed to have been attacked and shot by an intruder. Defendant denied having a specific recollection of events after he was shot. He claimed to have blacked out.

During the following days other evidence was developed that was inconsistent with defendant's initial account. Because of these inconsistencies, defendant was interviewed by highway patrolmen in Webster County on October 1, 1987, and a second time at the highway patrol Troop D headquarters in Springfield on October 5, 1987. In the October 1 interview, defendant gave a similar, but somewhat more elaborate, account of what he had told Roe on September 26. On October 5th defendant was told of certain physical evidence that was inconsistent with his initial account and that officers did not believe defendant. The defendant then gave two other accounts. In one version defendant claimed to have been abducted by Kirk and Steve. In the next account, defendant claimed he had been kidnapped by Kirk alone. Finally defendant confessed that he had killed all seven of the victims. Defendant repeated that confession in the presence of Deputy Roe. Thereafter he gave a videotaped confession.

## I.

Trial began on April 11, 1988. During the *voir dire* of potential jurors, defense counsel called off a list of expected state's witnesses and asked if any member of the venire knew those witnesses. Among those named were Webster County sheriff Eugene Fraker and Deputy Sheriff Don Roe. Charles George, a member of the venire, stated he knew both Fraker and Roe. The following exchange then occurred:

> MS. CHAPMAN [defense counsel]: Do you think because they are law officers they are entitled to more believability than others?

> VENIREMAN GEORGE: Not necessarily, but you know them and the job they have done and you believe them before you would a stranger.

At the close of *voir dire*, defense counsel moved to strike George for cause. The motion was overruled. In addition to the regular jury, the trial court decided to empanel two alternates. A list of twenty-three potential jurors was tendered to defendant for the purpose of making peremptory strikes. Section 546.180.3. Defendant used one of his nine peremptory strikes to remove George from the jury panel. *See* § 546.180.1(1).[2]

■ This Court recently considered the same statutory proceeding for challenging jurors that was applicable when this case was tried. After reviewing the history and caselaw construing §§ 546.150 and 546.180, the Court concluded that a defendant is entitled to a full panel of qualified jurors before making peremptory challenges and even though an unqualified juror does not actually serve, it is prejudicial error to fail to sustain a meritorious challenge for cause. *State v. Wacaser*, 794 S.W.2d 190, 193 (Mo. banc 1990).

■ The state candidly admits that because of George's answers to the questions regarding his partiality in favor of the testimony of Fraker and Roe, and the absence

of a more searching inquiry by the trial court, George should have been excused. A member of the venire who expresses a bias in favor of the credibility of a police officer expected to testify for the state is disqualified to serve as a juror. *State v. Draper*, 675 S.W.2d 863, 865 (Mo. banc 1984).

■ The question left open by *Draper* was what circumstances establish an absence of prejudice. *Draper* suggests some circumstances in which there may be no prejudice to a defendant; for example, where the police officer does not provide elements of the state's case, where more important evidence came from other witnesses, and where the police officer did not testify to any truly contested issue. The state argues that Fraker and Roe's testimony falls within the class of evidence referred to in *Draper* and thus no prejudice is shown by failing to excuse George. The state claims the testimony of Fraker and Roe was cumulative, uncontested and used by defendant to buttress a defense theory.

Fraker was the first officer to arrive at the Schnick farm. Both Fraker and Roe testified in some detail to observations made at the Schnick and Buckner homes on the day of the murders. Fraker identified photographs of the slain Buckner children. At one point Fraker apparently became somewhat emotional as he gave a description of what he saw at the Buckner home.

Roe and another officer left the Schnick residence and were the first to arrive at the Buckner residence. Roe collected physical evidence from both the Schnick and Buckner homes. He related his conversation with Schnick at the hospital regarding the events leading up to the homicide.

The testimony of Fraker and Roe was important when compared to other evidence because it established essential elements of the state's case and involved contested issues. Fraker's testimony established the date, location, approximate time and condition of the bodies when they were found. Fraker confirmed testimony of oth-

---

**2.** This section has since been repealed and reenacted as § 494.480.2(1). *See Laws of 1989, S.B. 127, et al.*

er persons arriving at about the same time and identified photographs of the victims.

Roe not only confirmed testimony of Fraker and other officers, he added evidence establishing a hostile relationship between defendant on one hand and Julie Schnick and the Buckner family on the other. Thus Roe's testimony, more than any other single witness's, established a motive for defendant to commit the homicides.

The fact that Fraker and Roe gave testimony that was uncontradicted, unimpeached and consistent with other testimony does not mean the weight of the testimony and credibility of the witnesses was not at issue. The credibility of witnesses and weight of evidence is always a question for the jury to decide. In addition, the Fraker and Roe testimony was not rendered beneficial to defendant because defense counsel attempted to use Roe's testimony to buttress a defense theory. On balance, the advantage of the Fraker and Roe testimony clearly went to the state.

The circumstances suggested in *Draper* demonstrating absence of prejudice are not present here. Because of his bias in favor of the testimony of Roe and Fraker, George was disqualified from serving on the jury. The list of potential jurors tendered to defendant for the purpose of making peremptory strikes consisted of an insufficient number of *qualified* jurors. The failure to sustain defendant's motion to strike George from the venire denied defendant his statutory right to a full panel of qualified jurors. For that reason, the conviction must be reversed.

In reaching the conclusion here, the Court is keenly aware that the jurors who actually sat and decided the case were qualified as impartial jurors. The right to have a list of qualified jurors from which to make peremptory strikes arises not from the Constitution; it is the product of §§ 546.150 and 546.180 and a long history of interpreting those statutes by the courts. The great web of statutes and precedent has been reinforced by the reenactment of almost identical language in

§§ 494.470 and 494.480 in 1989. If this Court were writing on a clean slate, the result might be different. Under these circumstances, if change is to come, it must be from the General Assembly. That body may desire to reconsider whether § 546.180.3 and its reenacted version, § 494.480.4, should be modified.

## II.

An issue raised here that is certain to recur on retrial is the ruling of the trial court on defendant's motions to suppress his statements. For that reason, the issue will be addressed.

Defendant made a statement to Deputy Roe on September 26, 1987, at the time Roe, accompanied by his wife, was at the hospital where defendant had been taken the previous day. Roe told defendant, "I'm your friend, but I'm here as a deputy sheriff." At the time, defendant appeared to be alert and conversant. Roe proceeded with the interview in which defendant stated his claim that he had been assaulted by an intruder. He also gave the lengthy account of an extramarital affair and his long-standing feud with Steve Buckner. He made no admissions of guilt in the conversation. According to Roe, defendant required little prompting in the giving of his story. At that time, defendant was not under arrest or in custody.

Defendant claims he was "deprived of his freedom" because he was in the hospital and thus, a *Miranda* [3] warning was required. This argument misapprehends what is meant by "deprived of his freedom." Defendant was not under arrest or restraint by Roe or any other law enforcement officer. Defendant could have stopped Roe's interview at any time and directed Roe to leave the room. Because the defendant was free to terminate the interview and require Roe to leave, the coercive aspects of a custodial interrogation were not present. Coercive police activity is the necessary predicate to finding any statement involuntary and inadmissible. *Colorado v. Connelly*, 479 U.S. 157,

---

3. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). The fact that a police interview occurs in a hospital concerning a gunshot victim's wound does not require the giving of a *Miranda* warning. *State v. Swingler,* 632 S.W.2d 267, 272 (Mo.App.1982).

Defendant claims that his statements made on October 1 and again on October 5, 1987, are also inadmissible. On both occasions a *Miranda* warning was given. He was driven to the Webster County courthouse by highway patrol officers on October 1, was on medication, used a walker, needed assistance climbing steps, moved slowly and complained of pain. Nevertheless, he told the officers there would be "no problem" going to the courthouse. During the interview defendant was permitted to prop his leg up, he was permitted to stop for water and to go to the restroom, and he was once allowed to stop the interview to work a cramp out in his leg. The interview lasted just two hours that afternoon. Officers wanted to have defendant take a polygraph examination that day, but defendant asked and was permitted to delay the polygraph.

The polygraph examination was scheduled on October 5, 1987. On that day, Bob and Dawn Henderson, friends of defendant, drove him to the Troop D highway patrol headquarters in Springfield. Although defendant was in a wheelchair at that time and complained of pain, he agreed to take the polygraph test to be administered by highway patrol Sgt. Don Smith. Smith explained the polygraph test, telling defendant the test could be terminated at any time and defendant was free to leave when he wanted to. Smith read aloud a form consenting to the polygraph and waiving his *Miranda* rights. Defendant signed the form. As Smith prepared to attach defendant to the polygraph, defendant said, "Don, I think we better stop. I don't think I want to take the test. I'm just so scared." Smith conferred with Roe, who had been monitoring the interview in another room. The two agreed they did not believe defendant's earlier stories. Smith returned, telling defendant of the inconsistencies in his earlier stories and that Smith and Roe did not believe defen-

dant had been truthful. Defendant then began a new version of events leading up to the homicides. Smith replied that he found the second account similarly incredible. Defendant then gave a third version. At that point, Smith described how he believed the murders began to occur based on the physical evidence. As Smith would make statements, defendant would confirm them. Then defendant began to recount how he had killed all seven victims. Defendant repeated his statement to Roe and finally gave his statement on videotape after being given a *Miranda* warning again. Defendant throughout this time was allowed access to water, a bathroom, and was permitted to take medication.

■ Defendant makes five separate arguments claiming the statements made during the September 26, October 1 and October 5 interviews are inadmissible. The first argument is that the trial court's findings of fact regarding the October 1 and October 5 interviews were insufficient because the trial court failed to determine that the statements and confessions were given after a knowing and intelligent waiver of defendant's rights. Among the trial court's findings made regarding the October 1 statement were the following:

The court finds that the defendant was advised of his constitutional rights in accordance with *Miranda, supra,* prior to defendant making any statement; that defendant demonstrated that he understood those rights; and, therefore that the statements made by defendant ... on October 1, 1987, were voluntarily and knowingly made.

With regard to the October 5 statement, the trial court made the following findings:

The court finds that defendant had previously been advised of his constitutional rights as prescribed by *Miranda, supra,* and that defendant was further advised of those rights October 5, 1987, before any statements were made by defendant ... The court finds that defendant had demonstrated, prior to October 5, 1987, that he understood those rights enunciated by *Miranda,* and that defen-

dant demonstrated on October 5, 1987, that he understood those rights; and, therefore, that the statements made by defendant to Sgt. Smith and Deputy Sheriff Roe on October 5, 1987, were voluntarily and knowingly made.

Defendant argues that these findings are insufficient to demonstrate that defendant's waiver of his rights was a knowing and intelligent waiver, relying on *State v. Bittick,* 806 S.W.2d 652, 658 (Mo. banc 1991).

The Court rejects the defense argument that *Bittick* requires the precise words "knowing and intelligent waiver" in a trial court's ruling denying a motion to suppress in order for ruling to be sustained on appeal. The finding here that the defendant was informed of his rights, understood his rights, and voluntarily made statements are sufficient findings to support overruling the motion to suppress. A judge need not make any particular formal finding. The only prerequisite is that the trial court's conclusions make unmistakably clear that the confession is voluntary. *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 642, 17 L.Ed.2d 593 (1967). If one is informed of his right to remain silent under *Miranda,* and understands his right to remain silent under *Miranda,* and thereafter makes voluntary statements, it is absurd to say that such person has not made a knowing and intelligent waiver of his right to remain silent. The first part of the argument that the motion to suppress should have been sustained is without merit.

■ The second argument attacking rulings on the motions to suppress is that appellant claims to have invoked his right to remain silent during the October 5 interview. That claim is founded on the statement of defendant made just before the polygraph was to begin, "Don, I think we better stop. I don't think I want to take the test. I'm just so scared." Plainly, the record reflects that this was not either directly or inferentially a request to stop the questioning. It was merely a statement that defendant did not want to undergo the polygraph examination. The situation presented here is analogous to that in *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987). There the defendant agreed to talk to police but declined to give a written statement. The United States Supreme Court held that if an invocation of the right to remain silent was clearly limited to written statements, oral statements are not subject to suppression. *Id.* 107 S.Ct. at 832. Here the defendant only requested that the polygraph terminate. Because Sgt. Smith honored defendant's request, no violation of an invocation of rights occurred. This aspect of the defendant's argument is also meritless.

■ Defendant argues that improper promises and inducements were made by Sgt. Smith in order to obtain defendant's confession. The alleged inducements occurred after Smith returned to the room and confronted defendant with the fact that the officers did not believe defendant. Smith stated that it looked "very bad for him," and defendant should "answer only for what he did." Smith explained the difference between first and second degree murder and that if "it's not a premeditated type of killing, then, it's second degree murder," and, "If it wasn't premeditated murder, you know, then you shouldn't be prosecuted for premeditated murder." Defendant argues that these statements amounted to an improper inducement for the confession. Here again the argument strains credulity.

A confession extracted by a direct or implied promise of leniency is inadmissible. *State v. Chandler,* 605 S.W.2d 100, 116 (Mo. banc 1980). Smith's statements distinguishing first and second degree murder gave no hint as to which crime would be charged. There was no implicit or explicit promise of possible leniency or mitigation of punishment. If defendant had a hope of leniency, that hope " 'springs from the seeds of his own planting [and] is not sufficient to render the resulting confession inadmissible.' " *State v. Hunter,* 456 S.W.2d 314, 321 (Mo.1970), quoting *23 C.J.S. Crim-*

*inal Law*, § 825, p. 212.[4] "General encouragement to cooperate is far different from specific promises of leniency." *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir.1987), *cert. denied* 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988). *See also State v. Clements*, 789 S.W.2d 101, 106–07 (Mo.App.1990).

■ The appellant also claims that the confessions and statements should have been deemed involuntary under the "totality of the circumstances." The only circumstances defendant would have us consider are defendant's physical and emotional condition and evidence that he suffered from an organic personality disorder. The record also shows that defendant was made as comfortable as possible at all times and could have terminated any of the interviews and left at any time of his choosing until after he made the confession on October 5. None of the officers employed the slightest artifice or threat to induce defendant to talk. There is nothing to suggest any basis for a finding of police overreaching in the present record.

Defendant's physical and mental condition is not the critical question in determining if defendant's statements were voluntary. "[M]ental condition, by itself and apart from official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 107 S.Ct. at 520. Here there is no evidence that the statements and ultimate confessions were the result of coercion. The state sustained its burden of proving by a preponderance of the evidence that under the totality of the circumstances, the defendant's statements were given voluntarily. *State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc 1980), *cert. denied*, 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980).

■ The final attack on the trial court's ruling on the motions to suppress is the claim that a suppressed statement made to Deputy Sheriff Roe on September 25, 1987, tainted all further statements taken from the defendant. In this regard defendant relies on the "fruit of the poisonous tree" doctrine. However, in defendant's argument he fails to explain how the subsequent statements were infected by the first statements. Thus the taint is merely hypothetical.

The "poisonous tree" doctrine was limited in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). There the United States Supreme Court noted that the taint of an involuntary confession could be attenuated by time and intervening circumstances. 105 S.Ct. at 1293. Assuming some taint existed, it was dissipated by the passage of time, defendant's improved condition on and after September 26 and the repeated advisement of appellant's rights prior to the defendant giving the statements in which he confessed to killing the victims. *See State v. Kilgore*, 771 S.W.2d 57, 61–62 (Mo. banc 1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989).

Significant also is that defendant's September 25 statement to Roe was not excluded by the trial court because the statement was coerced from defendant. The trial court excluded the September 25 statement because "defendant was incoherent due to his physical condition." The purpose of the "poisonous tree" doctrine is to penalize police misconduct in obtaining the initial statement and that purpose is not advanced in a case where no police misconduct occurred. *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 2364–65, 41 L.Ed.2d 182 (1974). In the absence of some coercion by police in obtaining the original statement, the "fruit of the poisonous tree" doctrine has no application.

■ In the post-conviction appeal, defendant complains that he was denied effective assistance of counsel at the motion to suppress hearing because defense counsel failed to call Bob and Dawn Henderson as witnesses. The Hendersons took defendant to the highway patrol headquarters on October 5. According to defendant those

---

**4.** *Hunter* was overruled on unrelated grounds in *State v. Olds*, 569 S.W.2d 745, 752 (Mo. banc 1978).

witnesses would have established his state of mind when he gave his confession. The post-conviction motion court found that defense counsel in fact raised the issue of defendant's mental state at the suppression hearing. Other evidence as to defendant's physical and mental condition was presented. The testimony of the Hendersons was at best cumulative. The Hendersons could not establish any overreaching by the police. Evidence of the defendant's physical or emotional condition alone unsupported by any evidence of coercion by the officers is insufficient to show the confession was involuntary. *Colorado v. Connelly,* 107 S.Ct. at 520; *State v. Lang,* 795 S.W.2d 598, 602–603 (Mo.App.1990). Because the Hendersons' testimony would not have established inadmissibility of defendant's statements, counsel was not ineffective in failing to call them at the suppression hearing.

### CONCLUSION

Other issues are raised in the direct appeal. Most of those issues are attacks on evidentiary rulings, argument, instructions or punishment. Those issues may or may not arise at a new trial and need not be resolved here. The claims found in the appeal of the post-conviction motion are similarly made moot by reversal of the direct appeal. Those issues will not be addressed.

Defendant's convictions are reversed and the cause is remanded for a new trial.

All concur.