STATE of Missouri, Respondent,

v.

Judith M. FAKES, Appellant.

No. WD 58156.

Missouri Court of Appeals,
Western District.

Submitted Nov. 9, 2000.

Decided April 10, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2001.

Application for Transfer Denied
Aug. 21, 2001.

James R. Anderson, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SMART, P.J., ELLIS and LAURA DENVIR STITH,[1] JJ.

SMART, Presiding Judge.

Judith Fakes was convicted of committing involuntary manslaughter in violation of Section 565.024.1(1), RSMo 1994, and was sentenced to a term of imprisonment of four years. She appeals her conviction, asserting, *inter alia*, that the trial court erred in allowing admission of statements which she made to police after her arrest. We reverse and remand.

1. Judge Stith participated in the case at the time of submission as a member of the court, and was specially assigned to remain on this case by order of the Supreme Court after her appointment to the Supreme Court.

## Factual Background

On April 2, 1995, Walter Betts was a resident of the Higginsville Habilitation Center in Higginsville, Missouri. Mr. Betts suffered from mental retardation as a result of hydrocephalus. Among Mr. Betts' limitations was lack of verbal articulation. Mr. Betts was 43 years of age at the time of the incident giving rise to the criminal charge in this case.

Judith Fakes was employed at the center as a developmental assistant. Ms. Fakes was the supervisor on duty on the morning of April 2, 1995. According to the trial testimony of Rick Hartgrave, who was also employed at the center, Mr. Hartgrave observed Walter Betts coming down the stairs from the employees' office at about 8:00 a.m. that morning. It appeared Mr. Betts had been drinking from a can of pop, which he still held in his hand. Because Mr. Hartgrave believed Mr. Betts occasionally took beverages belonging to others, Mr. Hartgrave was suspicious that the employees' office had been left unlocked and that Mr. Betts had taken someone's can of pop from the office. Hartgrave, observing Ms. Fakes coming up the hall, asked if she had left a can of Pepsi in the employees' office. When she said yes, Hartgrave informed Fakes of his observation of Mr. Betts. According to Hartgrave, Fakes grabbed Mr. Betts and forced him into the bathroom. Hartgrave said that Fakes held Mr. Betts by the neck and forced him to drink shampoo as a punishment for his transgression.

Fakes provided a somewhat different version. She contended that Betts and Hartgrave were already in the bathroom when she was informed that Mr. Betts had consumed her drink. Fakes said she offered the shampoo to Mr. Betts, putting it up to his lips, but that Mr. Betts declined to drink it. Fakes said that Hartgrave hit Mr. Betts several times in the neck.

Fakes said she admonished Hartgrave about hitting Mr. Betts, and then left the bathroom.

In any event, within an hour or two after any incidents that occurred in the bathroom, Mr. Betts' face began to swell and he began to demonstrate signs of respiratory distress. He had trouble drinking his coffee at breakfast, and did not seem to have an appetite. The nurse was summoned. By the time the nurse saw him, there was significant swelling of his neck. Even the tissues in his face were swelling by this time. Not knowing that Mr. Betts had suffered any trauma, the nurse believed he was having an allergic reaction. Both Fakes and Hartgrave knew the nurse thought Mr. Betts was suffering an allergic reaction, and had an opportunity to inform the nurse that Mr. Betts had endured trauma to his neck, but neither did so. Mr. Betts continued to become increasingly restless and uncomfortable. An emergency medical team was summoned, but Mr. Betts died before they arrived. His death occurred approximately three hours after the incident in the bathroom.

It was determined by the medical examiner that force applied to the neck of Mr. Betts caused injuries, including the fracture of his thyroid cartilage, which then caused swelling due to bleeding and the release of air into the tissues of the neck. The swelling gradually squeezed off Mr. Betts' trachea. At the same time, the air was being diverted, rather than going into the lungs. Both of these factors led to his suffocation. The autopsy revealed bruises on the neck consistent with a hard squeezing off the neck by fingers, which could have caused the injuries. Also, it appeared the injury to the thyroid cartilage could have been caused by a sharp blow, like a karate chop, to the front of the neck.

The police interviewed both Fakes and Hartgrave separately after advising each

one of their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[2] Each gave a statement to police. Hartgrave was charged with second degree murder. Eventually, Hartgrave negotiated a plea agreement to a charge of involuntary manslaughter, and agreed to cooperate with authorities by testifying against Fakes in a subsequent criminal prosecution of her.

After Hartgrave agreed to cooperate with a prosecution of Fakes, a charge of involuntary manslaughter was filed against her, asserting that she, either acting alone or with Hartgrave, recklessly caused the death of Mr. Betts. A warrant was issued for Fakes' arrest in early December 1997, about twenty months after the death of Mr. Betts. Cynthia Schroer, Assistant Chief of Police of the City of Higginsville, drove to Carrollton, where she and a Carroll County officer arrested Fakes at her residence. Officer Schroer transported Fakes to Higginsville, a drive of approximately 45 minutes.

On this occasion, Officer Schroer did not advise Ms. Fakes of her *Miranda* rights. What transpired after the arrest is recorded in Officer Schroer's report (which is set out in full in an appendix to this opinion). In that report, Officer Schroer describes the discussion between the two of them on the way to Higginsville, including the issue of what happened in the bathroom the day of the incident. The report also details the interrogation of Ms. Fakes at the police station in Higginsville by Chief Alumbaugh and Officer Schroer. After describing substantial questioning, the report states that Fakes became very emotional. The report says Fakes was placed in a cell to allow her time to compose herself. The report further states that after "a period of time" Fakes was brought back into the office and was advised of her *Miranda* rights, which Fakes said she understood. Fakes declined to give a written statement but "again verbally gave us all of the [same information] *after* waiving her rights" (emphasis added). At that point Fakes indicated she wanted an attorney, and the interview was terminated.

Prior to trial, Ms. Fakes filed a motion to suppress the statements she made during the time she was in custody following her arrest. The motion sought to suppress the statements made both in the vehicle and at the station. The motion requested both the statements made before and after the administration of the *Miranda* warnings be suppressed. Officer Schroer, testifying at the motion hearing, stated that Fakes was advised of her rights at the police station "after the booking process." The officer testified she received statements from Ms. Fakes both before and after Ms. Fakes was advised of her rights.

Q: After reading her the Miranda warnings, did you receive the same information from her?

A: Yes, I did.

Q: What information did she tell you after you read her, her Miranda warnings?

A: I specifically went over every point we had discussed from the time she was placed under arrest to the time I read her, her Miranda warning. I specifically clarified every point, every piece of dis-

---

2. Under *Miranda,* any confession made by an accused in connection with an in-custody interrogation will be presumed to be involuntary in violation of the Fifth Amendment (as applied to the states through the Fourteenth Amendment) unless the accused is first informed that he has a right to remain silent, that anything said can and will be used against him, that he has the right to consult a lawyer, and that if he is indigent a lawyer will be appointed to represent him.

cussion, every bit of discussion we had from the time she was arrested until that time, after reading her Miranda, including inconsistent statements made by Ms. Fakes.

The court denied the motion to suppress as to the statements made after she was given her *Miranda* warning. The trial court held the pre-warning statements were not admissible, except for rebuttal or impeachment purposes.[3]

The case proceeded to trial. In addition to testimony concerning the medical determination of the cause of death of Mr. Betts, and testimony related to the interviews of Fakes (presented over the objection of Fakes' counsel), the state presented the testimony of Hartgrave. Hartgrave testified that in the bathroom Fakes held Mr. Betts by the neck with one hand while forcing him to drink the shampoo. Hartgrave acknowledged that he "bopped" or "tapped" Mr. Betts on the chin with an open hand, which he said was just to keep him from spitting out the shampoo until they could get Mr. Betts to the sink to allow him to spit it out. Hartgrave denied that he struck Mr. Betts with a fist.

Fakes testified in her own behalf, offering a different version of events. Fakes testified the incident occurred after she brought a patient, Bobbie Jones, to the bathroom. She said Hartgrave and two other patients, including Walter Betts, were in the bathroom. Hartgrave, she said, told her about his observations with the can of pop. Fakes testified she stated, "Dang it Walter, if you want to drink something I will give you something to drink," and she brought him a bottle of shampoo. Fakes testified she did not hold Mr. Betts by the neck. Fakes admitted that she put the bottle to Mr. Betts' lips, but claimed that he did not drink it. Fakes further testified Hartgrave struck Mr. Betts in the neck with a closed fist several times. Fakes stated she rebuked Hartgrave for hitting Mr. Betts. She indicated Hartgrave hit Mr. Betts with enough force to alarm her, but not enough to cause her to put it in an incident report. Fakes denied forcing the liquid into Mr. Betts' mouth.

A: Walter did—he didn't drink the shampoo, and I just put the bottle—I took the bottle down, and walked around to put it back into the clients' box. And I turned around, and Rick was hitting him. And I told Rick that I never wanted to see him do that again. And Bobbie and I left the bathroom.

Fakes stated she did not know why the bathroom door was locked during the time she was in there, or who locked it.

Another employee of the center, Vickie Chinn, testified that she entered the bathroom during the time Mr. Betts and the others were in the bathroom. Ms. Chinn explained she found the door locked, so she used her key to enter. Ms. Chinn said Fakes told her the two of them (Fakes and Hartgrave) had made Mr. Betts drink "half a bottle of shampoo."

At the conclusion of the trial, the jury found Ms. Fakes guilty of involuntary manslaughter. She was sentenced to a term of imprisonment of four years. She appeals her conviction.

### Death Certificate

■ We first turn to appellant's contention concerning the admission of the death certificate of Walter Betts. Death certifi-

---

3. Unwarned statements have been held admissible for purposes of impeachment and rebuttal of an accused's courtroom testimony if they were not otherwise involuntarily obtained in violation of the Fifth Amendment. *Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

cates are generally admissible to prove death and generally to offer some evidence as to the immediate cause of death. Section 193.255 RSMo (1994). A death certificate is *"prima facie* evidence of the facts stated therein." § 193.255.2. A death certificate, therefore, is generally not subject to a hearsay objection.

 The appellant's real objection here is that the death certificate states the conclusion that the injury to the victim's airway was caused "by [an] attendant." Fakes contends this was harmful to her because it was clear from the evidence, she was "an attendant." When Dr. Lahue was asked about the cause of the victim's injury, the defense objected on grounds of hearsay, without making clear that the defense was objecting specifically to the "by attendant" reference. The objection was overruled. The doctor answered he determined that the victim had died of an injury to his airway. Then Dr. Lahue stated he had written "injury to airway by attendant resulted in respiratory insufficiency." There was no specific objection at that time to the assertion of the death certificate that the injury was caused by an attendant. On cross-examination, defendant's attorney then asked Dr. Lahue to confirm that he had no personal knowledge of who actually inflicted the injury, which the doctor did confirm. The doctor was asked about the source of the "by attendant" assertion, and the doctor could not remember or identify the source. Defendant's attorney then pointed out the doctor's notation was based on hearsay, but the defense did not move to strike the earlier remark, nor did counsel move for a curative instruction. "Generally, where evidence is apparently competent when it is admitted over objection, but its incompetency is made apparent by testimony which follows, the objection must be re-peated or it is waived." 75 AM.JUR.2D, Trial, § 413 (1991). Point is denied.

### Post–Arrest Statements

Fakes also argues on appeal the trial court erred in allowing testimony at trial as to the statements she made on December 5, 1997. Fakes contends her statements to the police were subject to exclusion not only because of the lack of timely *Miranda* warnings, but also because the statements were involuntary because they were extracted from her while she was upset, confused and emotional.

 Of course, it is true that Fakes was upset and surprised about her arrest. Her arrest occurred approximately 20 months after the death of Mr. Betts, and after the investigation had apparently concluded. The law is clear, however, evidence that an accused is surprised and emotionally upset, absent evidence of coercion by the police officers, is an insufficient basis to conclude that a confession was involuntary. *State v. Schnick,* 819 S.W.2d 330, 337 (Mo. banc 1991). Here, we see no evidence of improper coercive activity by the police in any non-*Miranda* sense. Accordingly, we hold that her statements were not rendered involuntary by her emotional condition of being surprised and upset.

We turn next to the issue of admissibility of Fakes' statements in view of the police failure to promptly advise her of her rights under *Miranda.* The trial judge held any statements made by Fakes prior to the receipt of her *Miranda* warnings must be excluded. The court regarded all of the pre-warning statements, both in the vehicle and at the station, as inadmissible under *Miranda.* The court ruled before trial, however, that any statements made *after* the warnings were given were admissible in evidence. The defense now contends on appeal, as it did throughout the

trial, that none of the statements made by Fakes on the night of her arrest were admissible because the post-warning statements were so dependent upon and so intertwined with the pre-warning statements that the two cannot be separated.

Fakes cites *State v. Wright*, 515 S.W.2d 421 (Mo. banc 1974), for the proposition that all of her statements made on the night of her arrest must be suppressed. In *Wright*, the defendant was arrested in connection with a robbery in which a man died. Wright was taken to police headquarters to be interviewed by detectives. The officer in charge of the investigation was in the process of interrogating another suspect, LeRoy Fair, when Wright was brought into the room. Without attempting to first advise Wright of his constitutional rights, the officer said to Wright, "What did you do with the shotgun?" or words to that effect. Wright responded, "LeRoy, you know I gave you the shotgun. I don't know where it is at." The officer then advised Wright not to make any further statements. Wright was taken to the juvenile detention facility. *Wright*, 515 S.W.2d at 423. The next day, Wright was interviewed by detectives with Wright's mother and a juvenile officer present. The officers advised Wright of his constitutional rights. He stated that he did not want an attorney and that he wanted to make a statement. Wright confessed participation in the planning and commission of the robbery. *Id.* At trial, the court refused to admit in evidence the initial statement about the shotgun. The trial court held, however, the statement the next day was voluntary and admissible in evidence. *Id.* at 424. In affirming the trial court decision, the Missouri Supreme Court stated in determining the voluntariness of the warned confession, the facts and circumstances must be examined to determine the degree of causal connection between any unconstitutional conduct (and

the statement resulting therefrom) and the confession made later. The court, in looking at the circumstances of Wright's later confession, noted the second interrogation came at a different time and place, and that it was attended by Wright's mother and the juvenile officer. The court held that the evidence did not indicate that the confession at the juvenile building had been coerced by the statement the previous day at police headquarters. *Id.* at 427.

Appellant Fakes suggests the rule applied in *Wright*—that the facts and circumstances must be evaluated to determine whether the later warned statement is actually voluntary in spite of the earlier admission—would dictate the exclusion of the warned statements in this case. Fakes argues that the warning of her rights came only after all the details of the matter had been thoroughly discussed. After the warnings were given, all that remained was for the officers to confirm the details of her earlier comments.

The State, in response, directs our attention to the 1985 United States Supreme Court case of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222. In that case, officers had information linking 18 year old Michael Elstad to a recent burglary. They went to Elstad's home with a warrant for his arrest. Elstad's mother answered the door and took the officers to Elstad. One of the officers stepped into the kitchen with Elstad's mother to explain the arrest. Meanwhile, another officer remained with Elstad. The officer testified:

> I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also

added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, "Yes, I was there."

*Elstad,* 470 U.S. at 301, 105 S.Ct. 1285. The officers transported Elstad to headquarters, and approximately an hour later officers advised Elstad for the first time of his *Miranda* rights. Elstad said that he understood his rights and he wished to make a statement. He then gave a full statement, admitting involvement in the burglary and incidentally admitting possession of marijuana. *Id.* at 301–02, 105 S.Ct. 1285.

Elstad sought to suppress both his initial oral remark and his subsequent confession. In the United States Supreme Court, the court began its discussion by noting that there is a distinction between a statement which is actually involuntary in violation of the Fifth Amendment and one which should be excluded only because of the failure to comply with the *Miranda* requirements. *Id.* at 306, 105 S.Ct. 1285. The court stated the "*Miranda* exclusionary rule" serves the Fifth Amendment and "sweeps more broadly" than the Fifth Amendment itself. *Id.* The court also specified that the concept of suppressing the "fruits of the poisonous tree" (drawn from *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)) follows from a Fourth Amendment violation, where a broad application of the "fruits" doctrine is necessary to deter unreasonable searches. *Elstad* at 306, 105 S.Ct. 1285. The court explained the *Miranda* presumption does not require a conclusion that unwarned statements and their fruits are "inherently tainted." *Id.* at 307, 105 S.Ct. 1285. The court referred to the fact that it has held that statements obtained in technical violation of *Miranda* but not in violation of the Fifth Amendment itself may be used for impeachment purposes on cross-examination. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The purposes of excluding confessions improperly coerced are (1) to exclude evidence which is of questionable reliability, and (2) to deter police from coercive tactics which tend to demean the individual and to produce confessions which might incorrectly cause police to believe the case is solved. The court in *Elstad* said that the absence of any actual coercion or improper tactics "undercuts the twin rationales—trustworthiness and deterrence—for a broader rule." *Elstad* at 308, 105 S.Ct. 1285. The court said that although *Miranda* requires that the unwarned admission be suppressed, the admissibility of any subsequent statement should turn "solely on whether it is knowingly and voluntarily made." *Id.* at 309, 86 S.Ct. 1602. The court discounted the notion that the psychological impact on an accused of a prior unwarned confession renders a subsequent warned confession involuntary.

> This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver.

*Id.* at 312, 86 S.Ct. 1602. The court said that when neither the initial nor the subsequent admission is coerced, "little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Id.*

The court in *Elstad* regarded the officer's initial breach of *Miranda* as relatively innocent. "The arresting officers' testimony indicates that the brief stop in the living room before proceeding to the station house was not to interrogate the suspect, but to notify his mother of the reason for his arrest." *Id.* at 315, 86 S.Ct. 1602.

Recently, in June of 2000, the U.S. Supreme Court reaffirmed the *Miranda* rules in *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The Court reiterated the notion that the *Miranda* rules were dictated by the requirements of the Fifth Amendment, although some of the Court's cases since *Miranda,* including *Elstad,* indicated that the *Miranda* rules went beyond the requirements of the Fifth Amendment. The Court also, accordingly, reaffirmed the proposition that *Miranda* is necessarily binding on state courts as well as federal courts. *Id.* at 2330. The Court did this without overturning *Elstad* or other cases seeming to loosen the requirements of *Miranda,* such as *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) and *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

While in the case before the bar there is little or no indication of actual coercion in the original discussion between Fakes and Officer Schroer in the police vehicle, this case differs significantly from *Elstad* and from *Wright* in that here the accused was subjected to a *lengthy* interrogation prior to being informed of her rights. Having brought Fakes to the police station with the intention of booking and interrogating her, the officers failed to advise her of her *Miranda* rights until *after* they had extensively questioned her, obtained an oral statement, and she had become so emotional they had to terminate the interrogation to allow her to calm down. Officer Schroer testified she did not advise Fakes of her rights at the time of her arrest because she did not intend to interrogate the accused while transporting her. No explanation was offered, however, for the failure to advise Fakes of her rights before interrogating her at the station. Perhaps

the officers thought that because in 1995 Fakes had voluntarily waived her rights after receiving the warning, there was no need to advise her again in 1997 after her arrest.

■ The transcript, taken in isolation, creates the impression that the officers were testifying about statements made by Ms. Fakes *after* she received her warnings. However, comparison of the testimony at trial with Officer Schroer's detailed report of the interrogation makes clear that several times Chief Alumbaugh, perhaps without anyone else realizing it, lapsed over into testifying about pre-warning statements. For instance, Chief Alumbaugh described that part of the interrogation during which he was "the heavy" and Officer Schroer played the sympathetic role. The Chief said that Fakes started out being "forthright and truthful," and then after he "turned up the heat" she "got very evasive and would not answer." [4] This was a reference to the interrogation *before* Ms. Fakes became so upset and emotional, which was before the warnings. It is fundamental since *Miranda* that when an arrestee is subjected to interrogation without having waived the right to remain silent, any silence or reluctance to answer questions should not be considered as evidence of guilt. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In this case, Fakes' evasiveness and reluctance to answer was offered as evidence against her by Chief Alumbaugh. The Chief also testified that he asked Fakes whether she could have mentally "blocked out" her memory of the facts in order to "live with herself," and that she said it was possible. Chief Alumbaugh also testified he accused Fakes of murdering Mr. Betts. When she protested, he asked her for her definition of murder, and she declined to

---

**4.** Although defense counsel objected to this testimony on other grounds, counsel obvious-

ly did not realize this was pre-warning testimony, so the testimony was not stricken.

give a response. He testified Fakes did not answer all of the questions he put to her. All of this also, we are convinced, occurred in the session before Fakes was advised of her rights. But even if some of these incidents were again discussed also, after she was advised of her rights, we think that the defense is correct that, in this case, the two statements—the warned and the unwarned—cannot be separated. Indeed, Officer Schroer made no attempt in her written report to separately report any questioning *after* the warnings, but simply refers to the discussion *before* the warnings, saying that the earlier statements were confirmed.

 Ever since *Miranda*, it has been clear that the privilege against self-incrimination extends beyond the doors of the courtroom. *Dickerson v. United States*, 120 S.Ct. at 2334. Judith Fakes had a right not to be a witness against herself while in the police vehicle and at the police station. She could waive that right and make a voluntary statement. In view of the fact that she was so extensively interrogated before she was advised of her rights, it is not as clear as in *Wright* and *Elstad* that she later voluntarily waived those rights when, after finally having been advised of her rights, she confirmed the statements made earlier. The interview at the station was extensive in length and was relatively intense, with Chief Alumbaugh playing the "heavy" and Officer Schroer playing the sympathetic person. No warnings were given until Ms. Fakes became too emotional to continue. No explanation is offered for this fact. Nor does the state argue the warnings given 20 months earlier, at a time when the accused was not under arrest, but was merely under suspicion, were sufficient to ensure the voluntariness of statements made without new warnings in 1997.

In *Elstad* and *Wright*, the pre-warning admissions were excluded from evidence; the issue was the admissibility of the *post-*warning admissions. Here, the trial court had already ruled the pre-warning statements were *not* admissible, yet significant testimony concerning the pre-warning statements was presented. Counsel had preserved an objection to *all* of the accused police station statements, warned and unwarned. Defense counsel placed a major emphasis on the exclusion of the 1997 statements from evidence, both pre-warning and post-warning.[5] After having the pre-warning statements suppressed by the trial court, counsel reiterated, in chambers, prior to trial, that he also wanted the post-warning statements suppressed. The trial judge stated that he was going to maintain the previous ruling allowing the post-warning statements, but he instructed the prosecution that if any pre-warning statements were to be used for *any* purpose (*i.e.*, rebuttal or impeachment), the prosecutor should approach the bench and disclose what he was seeking to introduce, and the matter could be discussed at the bench.

Once again, back in the courtroom, the court instructed the prosecution that before any pre-warning statements were referred to in the testimony, the prosecution must approach the bench out of the hearing of the jury. The prosecution agreed

---

5. The defense did not object to the warned statement made by Ms. Fakes when interviewed shortly after the death of Mr. Betts in 1995. The statement she made then was close in many ways to the 1997 statements she made to Chief Alumbaugh and Officer Schroer except that the 1995 written statement was less detailed, and did not include the issue of whether the door was locked. In the 1995 statement, Ms. Fakes did not particularly dissociate herself from Mr. Hartgrave's actions, nor did she say that she admonished him or objected to his act of striking Mr. Betts.

no pre-warning statements would be used. Defense counsel again made a record as to his objection to *any* statements made by Ms. Fakes on the day of her arrest. Defense counsel cited the case of *State v. Wright*, 515 S.W.2d 421, and moved (in advance) for a mistrial as to any testimony related to post-warning statements.

■ We assume the prosecution did not realize at the time of Chief Alumbaugh's testimony that the Chief included in his testimony at least some of what transpired before Ms. Fakes was advised of her rights, because the prosecution was under strict direction not to get into any pre-warned statements without first approaching the bench.[6] Indeed, because everyone assumed no pre-warning statements would be offered, we believe everyone failed to notice the problem. However, these circumstances of this case illustrate that when there has been an extensive interrogation without warnings, then the warnings are provided as an afterthought, and the post-warning interview is merely a confirmation of the unwarned interrogation, there is, of necessity, substantial doubt as to whether there has been compliance with *Miranda*. Then, to make matters worse, when the interrogator testifies concerning the unwarned interrogation and refers to the then unwarned suspect as "evasive" and "reluctant to answer questions," the effect is to undermine the *Miranda* protections altogether because the accused has not formally waived the right to remain silent (including the right

to be reluctant and evasive). We think that, in a case where the pre-warning interrogation is the only interrogation documented in detail and remembered in detail by the police, and the warnings have been provided as an afterthought, to allow any testimony of the interrogation is to allow a circumvention of *Miranda*. While scholars can still debate the extent to which *Miranda* is compelled by the Fifth Amendment, *Miranda* remains the law. *Dickerson*, 120 S.Ct. 2326 (2000).

The defense maintained throughout the trial that *all* of the testimony of the 1997 statements was inadmissible and that it was impossible to separate the pre-warned from the warned statements. We cannot say, in view of the fact that the defense consistently took the position that *all* of the December 1997 statements, warned and unwarned, were inadmissible, that the defense should be faulted for failing to point out to the trial court something no one then realized: the fact that the Chief's testimony was actually testimony as to the unwarned interrogation. Based upon the facts of this case, we do not believe the defense, after consistently objecting to all of the testimony on Fifth Amendment and *Miranda* grounds, should be held to have waived all objection to the pre-warned statements because of the failure to point out the prosecution's error in failing to distinguish the pre-warned statements from the post-warned statements.

---

6. The prosecution seemed to be under the mistaken belief that everything said at the Higginsville police station was said *after Miranda* warnings were administered. There is no possible way to construe Officer Schroer's police report that way. Nor is it reasonable to conclude that the police report was in error in that regard. Nor is it reasonable to believe that after the warnings were administered, Fakes once again started out being "forthright" and then after the Chief again "turned

up the heat," she got very evasive and would not answer, just as though the parties were role-playing again the unwarned interrogation. It is obvious that the Chief was testifying from memory, and he erroneously believed all of this took place after the warnings were given, which only illustrates why it is not a good idea to wait until the interrogation is virtually over to provide the accused with warnings.

The post-warning statements were obviously very closely linked to the extensive unwarned interrogation, and the administration of the warnings was a belated attempt, at the conclusion of the real interrogation, to breathe legal validity back into an improper interrogation. *See Miranda,* 384 U.S. at 496, 86 S.Ct. 1602; *State v. Williams,* 486 S.W.2d 468, 473 (Mo.1972) (accused confessed to crime after defective warning; confessed again several hours later after proper warning; neither confession held admissible).[7] The warnings were an afterthought, and were given only after a temporary recess in the interrogation. *Id.* Apparently, after the break in the questioning, the officers realized they had not properly warned Fakes. After carefully documenting the unwarned interrogation, the officers failed to document any details of the warned interrogation. Also, no reason was shown for the failure to advise Fakes of her rights before she was systematically interrogated at the police station. Accordingly, we do not believe that this case is like either *Wright* or *Elstad,* for the reasons discussed herein. The failure to do police work in proper fashion ended up affecting the trial. Although we do not believe there was intentional misconduct by the prosecution, the fact remains that a strict motion in limine was violated. It was violated because of the improper way the interrogation was conducted, and as a by-product of that improper interrogation. The result is that the accused's rights were violated.

### Prejudice

■ Because there was error introduced into the case, we will reverse for a new trial unless we are convinced beyond a reasonable doubt that the error was harmless. *State v. Miller,* 650 S.W.2d 619 (Mo. banc 1983). The evidence against Fakes, with or without the 1997 statements, is quite strong. She was not charged with murder or voluntary manslaughter, but with involuntary manslaughter, which is a reckless homicide. Section 565.024.1 RSMo 1994. The charge also asserted that she acted in concert with Hartgrave, so that the act of either would be attributable to Fakes in the joint enterprise of "punishing" Mr. Betts. The jury would have considered the testimony of Vicki Chinn, an independent witness, who said she had to use her key to get in the bathroom, and that when she did get in, Fakes told her that they had made Mr. Betts drink half a bottle of shampoo. This contradicted Fakes' trial testimony and earlier statement that Mr. Betts did not drink any of the shampoo. The medical evidence was consistent with the proposition that Betts' neck was squeezed by someone. Chinn's testimony also supported the notion that Fakes and Hartgrave together participated in the effort to "punish" Mr. Betts for his infraction. Also, in her 1995 statement, which Fakes wrote in her own handwriting, she did not dissociate herself from Hartgrave's alleged hitting of Betts. Thus, there was an abundance of evidence to support conviction, apart from evidence of the 1997 interrogation. However, in her trial testimony she did contend that Hartgrave acted independently in hitting Betts. She also contended she did not squeeze Mr. Betts by the neck while forcing him to drink shampoo. Although we think her credibility had been damaged by other evidence, we cannot say beyond a reasonable doubt she would have been convicted without the erroneously admitted testimony because the testimony of

---

**7.** In view of the decision in *Elstad,* the "tainted fruit" analysis applied in *Williams* would presumably be different today. Nevertheless, it is not clear that the result in *Williams* would necessarily be different.

the 1997 interrogation further damaged Fakes' already questionable credibility.[8] The testimony included evidence as to Fakes' equivocation about the door being locked, testimony about her becoming evasive and reluctant to answer some questions, and her statement that she might have "blocked out" some of what happened from her memory in order to be able to "live with herself." Although the evidence of her guilt was otherwise strong, we cannot say beyond a reasonable doubt that the error caused by the injection into the case of testimony as to the 1997 interrogation was harmless. Therefore, we reverse the conviction and remand the case for a new trial. On remand, all testimony related to the interrogation after Fakes' arrest in December 1997 should be excluded from evidence except for purposes of impeachment or rebuttal.

ELLIS, J., and LAURA DENVIR STITH, Sp.J., concur.

### Appendix

Fakes seemed quite surprised and confused as we drove from Carrollton to Higginsville. I told her I would answer any of her questions and explain everything I could. Fakes asked me what this was all about and I told her that Rick Hartgrave had [pleaded guilty] to the charge of involuntary manslaughter and that he had also given a statement as to her involvement in this. She stated she had no involvement other than what she had already said in her original statement to the investigators. She also said that she didn't know what happened to Walter Betts because all she knew that Rick Hartgrave did was to hit Betts under the chin a couple of times as she had originally said in her written statement.

She asked if she would have to stay in jail overnight. I told her that I would explain the procedures that would be followed to the best of my ability so that she would feel more at ease with what was happening. I explained that she had a bond of $25,000.00. When she said that she did not have that much cash, I explained the process of using a bondsman. I also explained that she would be arraigned on these charges. I asked her if she could afford to hire a lawyer and she said that she could not. I explained that a public defender would be provided to her by the courts.

During the ride Judy talked about what happened on the day that Walter Betts died. When she again told me that nothing happened in the bathroom, I asked her why the door was locked. She said it wasn't locked. I asked her why Vicki Chin had to use a key to get into the bathroom. Fakes said that Chin did not because she (Fakes) unlocked the door for her. Fakes then admitted that the door was locked, but that she just didn't know how the door

---

**8.** There is another aspect of the case that occurs to us in our determination as to whether Fakes would otherwise have been convicted. As the supervising attendant at the facility, Fakes had legal responsibility for the care of Mr. Betts. The jury presumably could have convicted Fakes even if it believed Hartgrave acted independently in causing the injury, if the jury believed the two were reckless in failing to protect Mr. Betts and in failing to see that he received necessary medical attention. However, the state did not seem to emphasize this theory of recklessness (*e.g.*, recklessness in failing to inform the nurse that Betts had suffered trauma to his neck, allowing the nurse to erroneously conclude that the swelling was an allergic reaction). Accordingly, the prosecution did not present medical evidence to show that if Fakes had properly informed the nurse, emergency attention would have saved the life of Mr. Betts. Thus, once again, we cannot say that we are persuaded beyond a reasonable doubt Judith Fakes would have been convicted without the improper testimony.

got locked. Fakes later said that she may have locked the door herself, but could not remember if she did.

When we arrived in Higginsville, I began taking her basic information for an arrest report. I also called Chief Alumbaugh to help me interview Judith Fakes as he was one of the original investigators on the case that took a statement from her in April of 1995.

We both advised Fakes that Hartgrave had given a statement to the prosecuting attorney of Lafayette county that while Betts was in the bathroom with Fakes and Hartgrave, she had grabbed Betts by the throat and poured shampoo down his throat. Fakes denied ever grabbing Betts by the throat but did admit to at first giving the bottle of shampoo to Walter to drink and then later admitted having her hand on the bottle and putting the shampoo to Walter's lips but said that she didn't think he actually got any shampoo in his mouth but couldn't say that for sure. She did say that she later told Vicki Chin that she and Rick had tried to make Walter drink some shampoo. She said that her left had was on his hand laying on his leg to keep Walter from grabbing the shampoo bottle. She did change her story as to Hartgrave's involvement saying that after she took the bottle of shampoo away from Walter's mouth, Hartgrave began punching Betts in the side of the neck with a closed fist. When asked why she didn't come forward with this information sooner and why she said he only hit him under the chin, she replied that this is what she was supposed to say. She admitted at this time to talking with Rick Hartgrave concerning this matter even after being told not to talk to him. She said that after she took a polygraph, she talked with Rick Hartgrave on the phone and possibly told him the questions that were asked on the polygraph. We asked Fakes if she had any type of relationship with Hartgrave and she said no, never. Chief Alumbaugh asked her if she had ever written any letters to Hartgrave and she said not that she could remember. I asked if there was any reason she wouldn't remember and she said no, she would remember and she didn't write any letters to Hartgrave. We told her that the prosecutor had been told by Hartgrave's lawyer that there were letters from Fakes to Hartgrave in his possession. She still denied ever writing any letters. She also denied grabbing Walter, saying that it was Rick who had hit Walter but that she did nothing to stop him but did tell him that he needed to stop. She also admitted that she did not report this or try to get Betts any medical help until later in the morning when she saw that he was having problems. Chief Alumbaugh asked Fakes if there was any way that she could have blocked out her part in all of this so that she could live with herself the last several years and Fakes agreed that it was possible. She even asked how she could get the mental blocks to go away. Fakes was very emotional at this time and we placed Fakes in a jail cell to give her time to compose herself.

After a period of time, I brought Fakes back into the office and read her the *Miranda* warning which she signed and agreed that she understood all that was in the warning. I even reminded her that she had signed one of these during the original investigation. Fakes did not want to give a written statement but again verbally gave us all the above information after waiving her rights. She at no time asked for an attorney. At the end of going over the same information as above, Judy did ask how she could get a lawyer and again I explained that if she could not afford a lawyer, she would be appointed one to represent her. We asked her again

**38**

to give a written statement and Judy refused saying she didn't want to do anything else without a lawyer present. Chief Alumbaugh and myself stopped all questioning at this time and I escorted Fakes back to her cell. She then asked if she couldn't call a lawyer tonight. I advised her that she could, but that we were not going to question her any further. I reminded her that she had told me that she couldn't afford an attorney but if she wanted to try to call one, she could. I again reminded her that the court would be appointing an attorney but that again, if she wanted to try to call this night, she could. She did not want to do so. Lafayette County deputies were called to transport Fakes to jail.

John M. Schilmoeller, Asst. Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, MO, Philip M. Koppe, Assistant Attorney General, Kansas City, MO, Attorneys for Respondent.

Before SMART, P.J., SPINDEN, C.J., and HOWARD, J.